**Fill in this information to identify the case:**

United States Bankruptcy Court for the: Southern District of New York

Case number *(if known)* ______________ Chapter 11

☐ Check if this an amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

**Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against a non-individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).**

## Part 1: Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed

**1. Chapter of the Bankruptcy Code**

*Check one:*

☐ Chapter 7
☑ Chapter 11

## Part 2: Identify the Debtor

**2. Debtor's name** Hamilton Reserve Bank Ltd

**3. Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

Nevis International Bank & Trust Ltd.

**4. Debtor's federal Employer Identification Number (EIN)**

☑ Unknown

EIN ______________

**5. Debtor's address**

| Principal place of business | Mailing address, if different |
|---|---|
| Hamilton Reserve Bank Plaza P.O. Box 174 | |
| Number Street | Number Street |
| | P.O. Box |
| Jessups Estate St. Thomas' Parish, Nevis | |
| City State Zip Code | City State Zip Code |
| County | **Location of principal assets, if different from principal place of business** |
| | Number Street |
| | City State Zip Code |

**6. Debtor's website** (URL) https://hrbank.com/

**7. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)
☐ Partnership (excluding LLP)
☐ Other type of debtor. Specify: ______________

**8. Type of debtor's business**

*Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A)

Debtor **Hamilton Reserve Bank Ltd** Case number *(if known)* ______

- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)
- ☐ Railroad (as defined in 11 U.S.C. § 101(44)
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A)
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6)
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3)
- ☑ None of the types of business listed.
- ☐ Unknown type of business.

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

- ☑ No
- ☐ Yes. Debtor ______ Relationship ______

District ______ Date filed ______ MM / DD / YYYY Case number, if known ______

Debtor ______ Relationship ______

District ______ Date filed ______ MM / DD / YYYY Case number, if known ______

## Part 3: Report About the Case

**10. Venue**

*Check one:*

- ☑ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).
The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

- ☑ The debtor is generally not paying its debts as they become due, unless they are in the subject of a bona fide dispute as to liability or amount.
- ☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

- ☑ No
- ☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| **NQ Receivable Holdings, LLC (f/k/a Hart Violet, LLC)** | **Deposit Liability** | $**4,226,123.69** |
| **LSPG Long-Term Strategies, LLC** | **Deposit Liability** | $**175,360.81** |
| **Velika LLC** | **Deposit Liability** | $**115,324.62** |
| | Total of petitioners' claims | $ |

**If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.**

## Part 4 Request for Relief

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

## *Continuation Page*

Debtor **Hamilton Reserve Bank Ltd**
Name

Case number *(if known)* ______________________

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | **RJJ International Holdings, LLC** | **Deposit Liability** | **$7,578.42** |
| | | | $ |
| | | | $ |
| | | Total of petitioners' claims | **$4,524,387.54** |

Debtor **Hamilton Reserve Bank Ltd** Case number *(if known)*

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**
**NQ Receivable Holdings, LLC (f/k/a Hart Violet, LLC)**
Name

**30 North Gould Street, Suite R**
Number Street
**Sheridan** **WY USA 82801**
City State Zip Code

**Name and mailing address of petitioner's representative, if any**
**Bryan Del Plazo,**
**Authorized Signatory of NextQuant Management LLC, Manager**
**c/o NextQuant Management LLC**
Name

**108 West 39th Street, Suite 1006**
Number Street
**New York** **NY USA 10018**
City State Zip Code

I declare under penalty of perjury that the foregoing is true and correct.
Executed on 11/13/2026
MM / DD / YYYY

[signature], manager
Signature of petitioner or representative, including representative's title

**Attorneys**

**Darren Azman**
Printed name

**McDermott Will & Schulte LLP**
Firm name, if any
**One Vanderbilt Avenue**
Number Street
**New York** **NY USA 10017**
City State Zip Code
Contact phone **(212) 547-5400** Email **dazman@mcdermottlaw.com**

Bar number **4911673**

State **New York**

**/s/ Darren Azman**
Signature of attorney
Date signed **11/13/2026**
MM / DD / YYYY

---

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**
**LSPG Long-Term Strategies, LLC**
Name

**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**
Number Street
**Charlestown, Nevis** **Saint Kitts and Nevis**
City State Zip Code

**Name and mailing address of petitioner's representative, if any**
**Harald Linhart,**
**General Manager of Lighthouse Management Services, LLC, Manager**
**c/o Lighthouse Management Services, LLC**
Name

**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**
Number Street
**Charlestown, Nevis** **Saint Kitts and Nevis**
City State Zip Code

I declare under penalty of perjury that the foregoing is true and correct.
Executed on
MM / DD / YYYY

Signature of petitioner or representative, including representative's title

**Attorneys**

**Darren Azman**
Printed name

**McDermott Will & Schulte LLP**
Firm name, if any
**One Vanderbilt Avenue**
Number Street
**New York** **NY USA 10017**
City State Zip Code
Contact phone **(212)547-5400** Email **dazman@mcdermottlaw.com**

Bar number **4911673**

State **New York**

**/s/ Darren Azman**
Signature of attorney
Date signed **11/13/2026**
MM / DD / YYYY

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**

**NQ Receivable Holdings, LLC (f/k/a Hart Violet, LLC)**
Name

**30 North Gould Street, Suite R**
Number Street

**Sheridan** **WY USA** **82801**
City State Zip Code

**Name and mailing address of petitioner's representative, if any**

**Bryan Del Plazo,**
**Authorized Signatory of NextQuant Management LLC, Manager**
**c/o NextQuant Management LLC**
Name

**108 West 39th Street, Suite 1006**
Number Street

**New York** **NY USA** **10018**
City State Zip Code

I declare under penalty of perjury that the foregoing is true and correct.
Executed on ____________
MM / DD / YYYY

____________
Signature of petitioner or representative, including representative's title

**Attorneys**

**Darren Azman**
Printed name

**McDermott Will & Schulte LLP**
Firm name, if any

**One Vanderbilt Avenue**
Number Street

**New York** **NY USA** **10017**
City State Zip Code

Contact phone **(212) 547-5400** Email **dazman@mcdermottlaw.com**

Bar number **4911673**

State **New York**

***/s/ Darren Azman***
Signature of attorney

Date signed **11/13/2026**
MM / DD / YYYY

---

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**

**LSPG Long-Term Strategies, LLC**
Name

**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**
Number Street

**Charlestown, Nevis** **Saint Kitts and Nevis**
City State Zip Code

**Name and mailing address of petitioner's representative, if any**

**Harald Linhart,**
**General Manager of Lighthouse Management Services, LLC, Manager**
**c/o Lighthouse Management Services, LLC**
Name

**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**
Number Street

**Charlestown, Nevis** **Saint Kitts and Nevis**
City State Zip Code

I declare under penalty of perjury that the foregoing is true and correct.
Executed on 11/13/2026
MM / DD / YYYY

____________
Signature of petitioner or representative, including representative's title

**Attorneys**

**Darren Azman**
Printed name

**McDermott Will & Schulte LLP**
Firm name, if any

**One Vanderbilt Avenue**
Number Street

**New York** **NY USA** **10017**
City State Zip Code

Contact phone **(212)547-5400** Email **dazman@mcdermottlaw.com**

Bar number **4911673**

State **New York**

***/s/ Darren Azman***
Signature of attorney

Date signed **11/13/2026**
MM / DD / YYYY

| Petitioners or Petitioners' Representative | Attorneys |
| --- | --- |
| **Name and mailing address of petitioner**<br>**Velika LLC**<br>Name<br><br>**c/o Lighthouse Management Services, LLC**<br>**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**<br>Number Street<br>**Charlestown, Nevis** **Saint Kitts and Nevis**<br>City State Zip Code<br><br>**Name and mailing address of petitioner's representative, if any**<br>**Harald Linhart,**<br>**General Manager of Lighthouse Management Services, LLC, Manager**<br>**c/o Lighthouse Management Services, LLC**<br>Name<br><br>**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**<br>Number Street<br>**Charlestown, Nevis** **Saint Kitts and Nevis**<br>City State Zip Code<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br>Executed on 11/13/2026<br>MM / DD / YYYY<br><br>Signature of petitioner or representative, including representative's title | **Darren Azman**<br>Printed name<br><br>**McDermott Will & Schulte LLP**<br>Firm name, if any<br>**One Vanderbilt Avenue**<br>Number Street<br>**New York** **NY USA** **10017**<br>City State Zip Code<br>Contact phone **(212) 547-5400** Email **dazman@mcdermottlaw.com**<br><br>Bar number **4911673**<br>State **New York**<br><br>**/s/ Darren Azman**<br>Signature of attorney<br>Date signed **11/13/2026**<br>MM / DD / YYYY |

| Petitioners or Petitioners' Representative | Attorneys |
| --- | --- |
| **Name and mailing address of petitioner**<br>**RJJ International Holdings, LLC**<br>Name<br><br>**c/o Lighthouse International Services, LLC**<br>**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**<br>Number Street<br>**Charlestown, Nevis** **Saint Kitts and Nevis**<br>City State Zip Code<br><br>**Name and mailing address of petitioner's representative, if any**<br>**Harald Linhart,**<br>**General Manager of Lighthouse International Services, LLC, Manager**<br>**c/o Lighthouse International Services, LLC**<br>Name<br><br>**A.L. Evelyn Ltd Building, Suite 1, P.O. Box 258**<br>Number Street<br>**Charlestown, Nevis** **Saint Kitts and Nevis**<br>City State Zip Code<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br>Executed on 11/13/2026<br>MM / DD / YYYY<br><br>Signature of petitioner or representative, including representative's title | **Darren Azman**<br>Printed name<br><br>**McDermott Will & Schulte LLP**<br>Firm name, if any<br>**One Vanderbilt Avenue**<br>Number Street<br>**New York** **NY USA** **10017**<br>City State Zip Code<br>Contact phone **(212) 547-5400** Email **dazman@mcdermottlaw.com**<br><br>Bar number **4911673**<br>State **New York**<br><br>**/s/ Darren Azman**<br>Signature of attorney<br>Date signed **11/13/2026**<br>MM / DD / YYYY |

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

## DECLARATION OF NEXTQUANT MANAGEMENT LLC, AS MANAGER OF NQ RECEIVABLE HOLDINGS, LLC, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003(A)

Pursuant to 28 U.S.C. § 1746, Bryan Del Plazo declares as follows:

1. I make this declaration (the "Declaration") on behalf of NextQuant Management LLC ("NextQuant"), as manager of NQ Receivable Holdings, LLC (f/k/a Hart Violet, LLC) (the "Petitioning Creditor"), in the above-captioned involuntary chapter 11 case (the "Bankruptcy Case") filed by the Petitioning Creditor and other petitioning creditors against Hamilton Reserve Bank Ltd. (the "Debtor"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to the Petitioning Creditor's claims against the Debtor. If called to testify in connection with the Bankruptcy Case, the following would constitute my testimony.

2. I am the authorized signatory of NextQuant, the manager of the Petitioning Creditor.

3. The Petitioning Creditor holds claims against the Debtor based on the Debtor's refusal to honor withdrawal requests from a USD deposit account maintained with the Debtor (the "Deposit Account"). As of the date of this Declaration, the Deposit Account reflected a balance of $4,226,123.69,[1] per the Debtor's online banking system.

4. The Petitioning Creditor's claims arise from the Debtor's failure to honor the Petitioning Creditor's instructions to withdraw and transfer funds held by the Debtor in the Deposit Account. On November 18, 2025, the Petitioning Creditor delivered a signed instruction to the Debtor directing the transfer of all funds held by the Debtor in the Deposit Account to the Petitioning Creditor's account at Raymond James & Associates Inc., which the Debtor did not execute. Thereafter, the Petitioning Creditor submitted approximately five additional transfer requests that the Debtor failed to honor, in whole or in part.

5. The Petitioning Creditor's claims arising from the Deposit Account, including any accrued but unpaid interest thereon, plus applicable fees, costs, and other charges, are being relied upon for the purpose of satisfying the requirements of 11 U.S.C. § 303(b)(1) and were acquired on May 24, 2025, pursuant to that certain Customer Account Agreement attached hereto.

6. The Petitioning Creditor may also hold other claims against the Debtor based upon other accounts, deposits, securities, or debt instruments of the Debtor.

---

[1] The Available Balance shown on the attached Account Statement is less than the amount listed here because it reflects transfers that were debited from the Deposit Account but never received by the intended recipient.

7. The Petitioning Creditor made deposits into the Deposit Account in the ordinary course of its banking relationship with the Debtor and not for the purpose of commencing the Bankruptcy Case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of November, 2026.

By: /s/ *Bryan Del Plazo*
Bryan Del Plazo
*Authorized Signatory of NextQuant Management LLC, as manager of NQ Receivable Holdings, LLC*

HAMILTON RESERVE BANK

# Account Statement

## HART VIOLET, LLC · 0010000023165

| ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|
| HART VIOLET, LLC | [redacted]3165 |
| **ACCOUNT TYPE** | **CURRENCY** |
| Corporate Savings Account | USD |

| DATE | DESCRIPTION | BENEFICIARY | TRANSACTION ID | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|---|
| 10/Nov/2026 | **Outgoing wire fee** | | AAACT26314TBP4Q1TR | -350.00 | | 4,041,423.69 |
| 10/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI2631007DZKQWMY | -100,000.00 | | 4,041,773.69 |
| 10/Nov/2026 | **Outgoing wire fee** | | AAACT2631417K39S5G | -350.00 | | 4,141,773.69 |
| 10/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI263100GB023LVN | -100,000.00 | | 4,142,123.69 |
| 09/Nov/2026 | **Outgoing wire fee** | | AAACT26313YJ8QT4TQ | -350.00 | | 4,242,123.69 |
| 09/Nov/2026 | **Repayment** | Black Pine Property LLC · 1171038453 | PI2631005H47TVN1 | -100,000.00 | | 4,242,473.69 |
| 09/Nov/2026 | **Outgoing wire fee** | | AAACT263136JCJK981 | -350.00 | | 4,342,473.69 |
| 09/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI26310076CWFH6X | -100,000.00 | | 4,342,823.69 |
| 06/Nov/2026 | **Outgoing wire fee** | | AAACT26310SWZRCNB6 | -350.00 | | 4,442,823.69 |
| 06/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI263080XWDVLYRZ | -100,000.00 | | 4,443,173.69 |
| 05/Nov/2026 | **Outgoing wire fee** | | AAACT26309Q7FGPS54 | -350.00 | | 4,543,173.69 |

| | | | | | |
|---|---|---|---|---|---|
| 05/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI263080XWDVLNXS | -100,000.00 | 4,543,523.69 |
| 05/Nov/2026 | **Outgoing wire fee** | | AAACT26309Q7FGPCGN | -350.00 | 4,643,523.69 |
| 05/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI263080XWDVLFJR | -100,000.00 | 4,643,873.69 |
| 04/Nov/2026 | **Outgoing wire fee** | | AAACT26308T00Q5RY8 | -350.00 | 4,743,873.69 |
| 04/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI263080XWDVL5QT | -100,000.00 | 4,744,223.69 |
| 04/Nov/2026 | **Outgoing wire fee** | | AAACT26308T00Q4YND | -350.00 | 4,844,223.69 |
| 04/Nov/2026 | **FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI26308121Q09B08 | -100,000.00 | 4,844,573.69 |
| 03/Nov/2026 | **Outgoing wire fee** | | AAACT2630744DDWJ7N | -350.00 | 4,944,573.69 |
| 03/Nov/2026 | **Invoice No 202611024186** | Lighthouse Management HK Limited · 390204737 | PI263061439S2X3Y | -84,000.00 | 4,944,923.69 |
| 28/Oct/2026 | **Outgoing wire fee** | | AAACT26301Z65NY5H4 | -350.00 | 5,028,923.69 |
| 28/Oct/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI26289106ZQ94N1 | -100,000.00 | 5,029,273.69 |
| 27/Oct/2026 | **Outgoing wire fee** | | AAACT263004LH13R7N | -350.00 | 5,129,273.69 |
| 27/Oct/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI262890C8BQ46BQ | -100,000.00 | 5,129,623.69 |
| 26/Oct/2026 | **Outgoing wire fee** | | AAACT26299520Z4CJR | -350.00 | 5,229,623.69 |
| 26/Oct/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI2628909J4YP257 | -100,000.00 | 5,229,973.69 |
| 20/Oct/2026 | **Outgoing wire fee** | | AAACT26293NCR24W59 | -350.00 | 5,329,973.69 |
| 20/Oct/2026 | **Repayment of Loan** | Black Pine Property LLC · 1171038453 | PI2629307MN02258 | -75,000.00 | 5,330,323.69 |
| 24/Sep/2026 | **Outgoing wire fee** | | AAACT26267T05YQB82 | -350.00 | 5,405,323.69 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24/Sep/2026 | **Repayment of Loan** | Black Pine Property LLC · 1171038453 | PI2625809W7D1TXR | -100,000.00 | | 5,405,673.69 |
| 17/Sep/2026 | **Outgoing wire fee** | | AAACT2626034MH7ZHX | -350.00 | | 5,505,673.69 |
| 17/Sep/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI262500SD5ZD837 | -100,000.00 | | 5,506,023.69 |
| 02/Sep/2026 | **Outgoing wire fee** | | AAACT2624527NVHLKH | -350.00 | | 5,606,023.69 |
| 02/Sep/2026 | **Reference FFC Hart Violet LLC AC 647KU513** | Raymond James and Associates Inc · 40776559 | PI2624406XZWXDTH | -100,000.00 | | 5,606,373.69 |
| 27/Aug/2026 | **Outgoing wire fee** | | AAACT26239ZJLRK6GZ | -350.00 | | 5,706,373.69 |
| 27/Aug/2026 | **Loan Repayment** | Black Pine Property LLC · 1171038453 | PI2623603JJ69182 | -100,000.00 | | 5,706,723.69 |
| 10/Aug/2026 | **Return Wire Fee** | | CHG2622230160 | -100.00 | | 5,806,723.69 |
| 10/Aug/2026 | **WIRE RETURN, VD 14 JUL 26 B/O RAYMOND JAMES AND ASSOCIATES INC. TRN REF: BNK26187KKGFCFCK** | | DC262220001001002 | | 100,000.00 | 5,806,823.69 |
| 30/Jul/2026 | **Outgoing wire fee** | | AAACT26211B32PMBH4 | -350.00 | | 5,706,823.69 |
| 30/Jul/2026 | **Payment of Invoice** | Lighthouse Management HK Limited · 390204737 | PI262080WH821R7X | -75,000.00 | | 5,707,173.69 |
| 30/Jul/2026 | **Outgoing wire fee** | | AAACT26211B32PF18F | -350.00 | | 5,782,173.69 |
| 30/Jul/2026 | **Loan Payout Payment 3 of 5** | Marker AG · ••••2007 | PI2619709R9C0Y5T | -100,000.00 | | 5,782,523.69 |
| 22/Jul/2026 | **Outgoing wire fee** | | AAACT26203HNGWDW9L | -350.00 | | 5,882,523.69 |
| 22/Jul/2026 | **Payout of Loan Part 1** | Marker AG · ••••2007 | PI261960WQS173WN | -100,000.00 | | 5,882,873.69 |
| 20/Jul/2026 | **Outgoing wire fee** | | AAACT2620144SZ6RRK | -350.00 | | 5,982,873.69 |
| 20/Jul/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI2618709Y8GM3KD | -100,000.00 | | 5,983,223.69 |

| | | | | | |
|---|---|---|---|---|---|
| 14/Jul/2026 | **Outgoing wire fee** | | AAACT261953MZ5PBBQ | -350.00 | 6,083,223.69 |
| 14/Jul/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI2618702J8NXZ5Q | -100,000.00 | 6,083,573.69 |
| 08/Jul/2026 | **Outgoing wire fee** | | AAACT26189VKDL2P2R | -350.00 | 6,183,573.69 |
| 08/Jul/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI261840J7WVQ9T9 | -100,000.00 | 6,183,923.69 |
| 07/Jul/2026 | **Outgoing wire fee** | | AAACT261880XM26XCZ | -350.00 | 6,283,923.69 |
| 07/Jul/2026 | **Investment Contract** | Raymond James and Associates Inc · 40776559 | PI26184076P82RYH | -100,000.00 | 6,284,273.69 |
| 23/Jun/2026 | **Outgoing wire fee** | | AAACT2617487LY3G69 | -350.00 | 6,384,273.69 |
| 23/Jun/2026 | **Repayment of Loan** | Black Pine Property LLC · 1171038453 | PI2617410QWHHXR0 | -100,000.00 | 6,384,623.69 |
| 23/Jun/2026 | **Outgoing wire fee** | | AAACT261744JR62DV1 | -350.00 | 6,484,623.69 |
| 23/Jun/2026 | **Repayment of Loan** | Black Pine Property LLC · 1171038453 | PI261740TYTVS363 | -100,000.00 | 6,484,973.69 |
| 22/Jun/2026 | **Outgoing wire fee** | | AAACT261730R4LWHRZ | -350.00 | 6,584,973.69 |
| 22/Jun/2026 | **Investment Contract** | Marker AG · ••••2007 | PI261690TT3913XK | -100,000.00 | 6,585,323.69 |
| 19/Jun/2026 | **Certified Bank Statement Fee** | | CHG2617063297 | -600.00 | 6,685,323.69 |
| 12/Jun/2026 | **Outgoing wire fee** | | AAACT26163JT64T9HS | -350.00 | 6,685,923.69 |
| 12/Jun/2026 | **2nd Final Invoice** | Bryan Del A Plazo · 010980013496 | PI261630342ND50T | -5,000.00 | 6,686,273.69 |
| 11/Jun/2026 | **Outgoing wire fee** | | AAACT26162BWBQJMR4 | -350.00 | 6,691,273.69 |
| 11/Jun/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI2616205SKZ9XD6 | -100,000.00 | 6,691,623.69 |
| 11/Jun/2026 | **Outgoing wire fee** | | AAACT26162BWBQFRKM | -350.00 | 6,791,623.69 |
| 11/Jun/2026 | **Invoice NQ2026 0004** | Bryan Del A Plazo · 010980013496 | PI2616205SKSDXZ1 | -5,000.00 | 6,791,973.69 |

| | | | | | |
|---|---|---|---|---|---|
| 11/Jun/2026 | **Outgoing wire fee** | | AAACT26162BWBQD3SG | -350.00 | 6,796,973.69 |
| 11/Jun/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI261620PXMNG5K7 | -100,000.00 | 6,797,323.69 |
| 08/Jun/2026 | **Outgoing wire fee** | | AAACT26159MKV4D3Z0 | -350.00 | 6,897,323.69 |
| 08/Jun/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI261590KVVBBGJD | -100,000.00 | 6,897,673.69 |
| 08/Jun/2026 | **Outgoing wire fee** | | AAACT26159N9GW2804 | -350.00 | 6,997,673.69 |
| 08/Jun/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI261590KVVBB3HG | -100,000.00 | 6,998,023.69 |
| 04/Jun/2026 | **Outgoing wire fee** | | AAACT261550KW498MV | -350.00 | 7,098,023.69 |
| 04/Jun/2026 | **Repayment of Loan** | Black Pine Property LLC · 1171038453 | PI261550CBFZN7NB | -100,000.00 | 7,098,373.69 |
| 27/May/2026 | **Outgoing wire fee** | | AAACT26147HY3T6R21 | -350.00 | 7,198,373.69 |
| 27/May/2026 | **Investment Agreement** | Raymond James and Associates Inc · 40776559 | PI261460WKHX0TNY | -100,000.00 | 7,198,723.69 |
| 27/May/2026 | **Outgoing wire fee** | | AAACT26147HY3SXLLY | -350.00 | 7,298,723.69 |
| 27/May/2026 | **Investment Agreement** | Raymond James and Associates Inc · 40776559 | PI261460SVC0RKBY | -100,000.00 | 7,299,073.69 |
| 26/May/2026 | **Outgoing wire fee** | | AAACT2614663TDXP4H | -350.00 | 7,399,073.69 |
| 26/May/2026 | **Investment Agreement** | Raymond James and Associates Inc · 40776559 | PI261460WKHX08HP | -100,000.00 | 7,399,423.69 |
| 18/May/2026 | **Outgoing wire fee** | | AAACT26138VPKT9GGH | -350.00 | 7,499,423.69 |
| 18/May/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI261350X4QB73B7 | -100,000.00 | 7,499,773.69 |
| 15/May/2026 | **Outgoing wire fee** | | AAACT26135LXZPF1JT | -350.00 | 7,599,773.69 |
| 15/May/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI26135023KZCQ33 | -100,000.00 | 7,600,123.69 |
| 15/May/2026 | **Outgoing wire fee** | | AAACT26135LXZPDMV7 | -350.00 | 7,700,123.69 |
| 15/May/2026 | **Investment Agreement** | Marker AG · ••••2007 | PI261350X4QB63QT | -100,000.00 | 7,700,473.69 |

AVAILABLE BALANCE AS OF 13/NOV/2026 USD **3,541,423.69**

**HAMILTON RESERVE BANK**

*"The Hometown Bank of Alexander Hamilton"*

Hamilton Reserve Bank Plaza, Jessups Estate, Nevis, Saint Kitts and Nevis

Telephone: +1 (869) 469-8889 | www.hrbank.com | SWIFT: NIBTKNNE

**COMMERCIAL BANKING | CUSTODIAN BANKING | ASSET MANAGEMENT | INVESTMENT BANKING**

# HAMILTON RESERVE BANK LTD.
# CUSTOMER ACCOUNT AGREEMENT
**Effective: September 6, 2021**

The words "you," "your," "account holder," and "Customer" mean the person or legal entity that has submitted an account application (hereinafter an "Account Application") to or opened an Account with the Bank, as well as all signatories on any Bank documentation.

The words "Bank," "we," "our," and "us" mean *Hamilton Reserve Bank Ltd.*, a bank chartered under the laws and governance of the Island of Nevis of the Federation of St. Kitts & Nevis, as well as any Bank affiliates or partners.

This is your customer agreement with the Bank (the "Agreement"). The Bank will provide you with additional agreements and documentation throughout our relationship with you which are part of this Agreement. As such, this Agreement includes:

(a) the terms and conditions governing all activity in relation to the existence and operation of your deposit accounts with the Bank.

(b) those certain additional terms and conditions that the Bank provides to you in writing prior to approving your account to utilize a particular banking service or facility including any account opening forms.

(c) all interests and Fees charged by the Bank, the benefits we supply to you, ourselves, and the terms and conditions of this Agreement, as well as any additional documentation we may provide to you from time to time.

To the extent that the Bank provides you with more specific terms and conditions regarding your Account and relationship with the Bank, those terms and conditions shall supersede those described below. Your use of a credit card offered through the Bank is not controlled by this Agreement and is instead governed by a separate agreement that is provided upon an application for a Bank issued credit card.

## DEFINITIONS

The following are definitions of some of the key terms used in this Agreement:

a. "**Account**" means any account that accepts deposits regardless of currency or asset type thatis covered by this Agreement.

b. "**Account Holder**" means the individual or business entity owning the Account**.**

c. "**Authorised Signatory**" means any signatory to an Account Application.

d. "**Available Balance**" means the balance in your Account excluding any pending credit or

debit transactions or amounts that are not available for withdrawal pursuant to the Bank Funds Availability Policy (defined below), that we are otherwise legally obligated to pay.

e. "**Business Day**" means every day except Saturdays, Sundays, and certain Bank Holidays. Depending on the particular Bank service provided, certain business operations may be unavailable from time to time due to local bank holidays in the United States, the United Kingdom, and India.

f. "**Business Hours**" means the hours between 8:00AM and 4:00PM (Eastern Standard Time) on any Business Day.

g. "**Funds Availability Policy**" means a policy kept at the discretion of the Bank and includes a variety of factors relating to the availability of funds in an Account. While the availability of funds shall always remain subject to the Bank's unencumbered and sole discretion, it is informed by those various legal and financial risks particular to your Account. For further detail on how this policy may affect your Account, please inquire directly with Bank management.

h. "**Item**" means any ACH, wire, funds transfer, ATM withdrawal, debit or credit card purchase, Fee, charge, or other amount that is added to, or subtracted from, the balance of assets in your Account.

## ACCOUNTS & SERVICES

1. Account Opening Forms. Every person or entity opening an Account must complete a new Account Application in order to establish a basic deposit account as well as any other documentation required by the Bank in connection with additional services you use that are provided by the Bank.

2. Who Can Open Accounts with the Bank. Accounts may be opened by individuals and legal entities around the world, subject to compliance review and approval. You agree that the Bank may decline to open an Account for any reason.

3. Business Accounts. If you have opened your Account as a "Business Account" using the Business Account Application or any other documentation we have provided to you, you agree not to use the Account for personal purposes. Unless otherwise described in Bank Documentation, a "Business" or "Business Organization" shall be a corporate, limited liability company, limited company, or other legal entity formed under the laws of the jurisdiction of its formation, any governmental organization, or validly created trust. We may rely on the accuracy and authority of any and all Business resolutions, signatures, certificates of incorporation, by-laws, operating agreements, trusts, authorisations, resolutions, or other documentation provided to us, or that we request in connection with any Business Account.

4. Additional Documentation. You must also complete or provide any other documentation we may require from time to time. We will conduct due diligence in our discretion on each Account Holder and Authorised Signatory prior to the time an Account is opened. We may rely upon the documentation we have in our files regarding the identity of the Authorised

Signatories on your Account until you present appropriate documentation identifying other Authorised Signatories. If we do not obtain the information we need under our customer identification program, we reserve the right to prevent you from accessing the funds in your Account until we obtain that information, and you agree we will not be liable to you if any payment order is not paid during this time. Subject to our anti money laundering and counter terrorist financing program requirements, we will tell you in writing if we take this action.

5. Powers of Authorised Signatory to modify Account Information. No Authorised Signatory may remove or add the name of another Authorised Signatory unless the resolutions designating the Authorised Signatories specifically permit that Authorised Signatory to do so.

6. Making Deposits. You may make an electronic deposit into your Account in person at any of our branch offices, through another financial institution, or by any other physical or electronic method we make available. The Bank does not currently issue or accept cheques or accept cash deposits. We may refuse a deposit, limit the amount of a deposit, or return all or a portion of a deposit. When the Bank receives an electronic deposit to your account, the only affirmative notice you will receive from us is on your next statement. You may login to any online banking account provided by the Bank to check your balance and deposits at any time so long as that Account has been set up by you and the Bank. You may also call the Bank during regular Business Hours to confirm that we have received a deposit. Any telephone communication with Bank personnel will be subject to reasonable security procedures which you agree may be implemented subject to the sole discretion of the Bank. If the bank or other party that sent an electronic deposit to your Account advises the Bank that the transfer was made in error, or was intended for another customer or account, the Bank may immediately deduct the transferred amount from your balance without conducting an investigation into the claim of error.

7. Right to Refuse Deposits. We are not responsible for any deposit you send to us that we do not receive. All deposits to your Accounts, regardless of how made, are subject to verification, final payment, and our Funds Availability Policy. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. The Bank does not accept cash deposits and shall have no obligation whatsoever to hold, maintain, or return any cash deposit received by mail or in person.

8. Correspondent and Financial Agents. In order to provide you with the best service, the Bank may use the services of certain correspondent banks, financial entities and institutions, banking software providers, as well as digital services companies and common carriers ("Banking Agents"), as well certain funds transfer methods and account systems provided as part of the services provided by such Banking Agents in order to provide services to you under this Agreement. You agree that any Banking Agent shall be your agent with actual authority to act on your behalf in providing any banking services. As such, the Bank shall not be liable to you by reason of: (i) any act or omission by a Banking Agent that is beyond the reasonable control of the Bank, or; (ii) the loss, diminution, or destruction of any funds, security, certificate, document, or asset of any kind while in transit or custody of any Banking Agent, or while under the possession, custody, or control of a person or entity other than the Bank.

9. Calculating Interest in Your Account. The Bank may or may not pay interest on your account at the Bank's sole discretion. If interest is paid, you must be notified by the Bank in writing. The interest rate of interest accruing in your account (the annualpercentage yield or ("APY") on all interest-bearing checking, savings, brokerage, money market savings, or other Accounts may change at any time after the Account is opened. The interest rate and APY may be changed by the Bank as often as we choose, without limits and without notice. The Bank calculates interest on Accounts utilizing the daily balance method, applying a daily periodic rate to the available principal balance in your Account each day. Asa general matter, interest in your Account is calculated based on the assumption of a 365-day year. Deposits in Your Account will begin to accrue interest on the Business Day that the fundsare included under your Available Balance. Earned interest shall be paid to you by crediting the amount of the accrued interest to your Account. If you close your Account before interest is credited, we shall not be obligated to pay you that interest.

10. Withdrawals. Notwithstanding a more specific agreement with the Bank in relation to a particular Bank service or facility, Assets from your Account generally may be withdrawn three business days after they have cleared in your Account. The availability of funds in your Account to withdraw does not mean the deposit made in your Account is "good," has "cleared" or has been paid by the paying financial institution. As a general matter, and except as otherwise provided in the Agreement, you may make withdrawals from your Account up to the amount of the Available Balance using any means or method that the Bank makes available to you. We may require two forms of identification for any withdrawals or transfers out of your Account to be presented at any branch office of the Bank. We may also contact you electronically through electronic means or directly by phone to confirm your identity and verify your authorization to conduct the withdrawal. While we reserve the right to refuse a withdrawal request exceeding the available funds in your Account (even in the case of deposit made by you later in the Business Day after a withdrawal request is refused) the Bank will endeavor to make your assets available to you as promptly as possible within its discretion and the parameters of its Funds Availability Policy. For information about when funds from a deposit become available and you can withdraw them, please see the Definitions Section of the Agreement, or inquire directly with Bank management regarding the Bank Funds Availability Policy.

11. Refusal of Withdrawals. Before allowing funds to be withdrawn from your Account, we may request that you provide us with certain confirmations, identification, authorisations, documentation, or other information that the Bank determines to be necessary in its sole and absolute discretion. You acknowledge that your refusal to comply with any such request may result in the Bank's refusal to allow the withdrawal. The Bank is not required to notify you in advance if it will seek additional information prior to allowing a withdrawal from your Account.

12. Multiple Signature Requirements. If you elect to require multiple signatures in order to conduct business in your Account, this requirement will be strictly enforced by the Bank.

13. Minimum Account Balance. The Bank may require a minimum Account opening balance or equivalent value in addition to related Fees per Personal or Business Account. Should your Account opening balance fall below these minimum balances, you will receive a notice of the

deficiency. The Bank has the right in its sole discretion to close Accountsor reject Account applications for Accounts that fall below, or would not meet, the minimum required Account opening balances. The Bank may charge Fees against your Account so longas they remain under the minimum required opening balance.

14. Insufficient Balance on Withdrawal. If your available balance is not enough to pay a transaction you make and we pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Paid Fee. If we do not pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Returned Fee. In either case, additional Fees may also be charged to your Account.

15. Fees. You agree to pay any fees, charges, or other costs (collectively referred to herein as "Fees") applied to your Account from the balance of your Account, even if that balance may be negative. The Bank may apply Fees to your Account for those amounts, purposes, and with any frequency, it deemsappropriate in its sole discretion. Moreover, the Bank may apply different Fees by reason of, among other things, the amount of funds or assets held in a given Account or Accounts, the services provided to an Account Holder, as well as the Account Holder's relationship with theBank. Such Fees may be applied and changed without prior notice to you and will be reflected inyour monthly statements. For more information on specific Fees and charges applied by theBank to your Account, please contact your Bank relationship manager or, as available, submita question through the Bank's secure customer portal online. While the Bank shall not be required to provide you with any particular Fee schedule, any schedule of Fees provided to youin writing shall be deemed a part of this Agreement.

16. Online Account Availability**:** Subject to the availability of any of the Bank's information technology providers and telecommunications carriers, or as necessary for the Bank to conduct maintenance or upgrades to the software or the Bank's online services, Access to any online banking services made available by the Bank will be generally available 24 hours a day and 7 days a week. As the Bank relies on various software and telecommunications systems, the Bank shall only be responsible for that information which its staff receives and shall not be liable to Account Holder for any disruptions, unavailability, or errors arising from of one or more aspects of any software if such software was implemented or is serviced by third parties.

17. Account Statements and Account Notices. All Account statements and notices will be made available to you exclusively and electronically through the Bank's online banking services and/or secure login messaging center. The Bank does not mail physical account statements or offer mail holding services. You agree that it is your responsibility to sign up for, and regularly monitor, your online account. The Bank shall not be liable for any losses that arise in your Account as the result of your failure to monitor your account or respond to Bank notice regarding your Account. Statements of your Account shall be made available online on a monthly basis and will reflect activity in your Account occurring subsequent to your last statement. Your statement shall be deemed delivered to you at the time it becomes available to you through the Bank's online banking systems. One signatory to the Account will be provided access to the online banking systems and is solely responsible for conveying all statements and notices to the Account Holder.

18. Your Obligation to Review Account Statements. You have an affirmative obligation to review all Account statements and notices online and to immediately notify the Bank of any errors in those statements or notices. Your obligation to review your Account information generally also includes:

    (a) Examining all activity in your Account and statements on a prompt and regularbasis.

    (b) Notifying the Bank within three (3) days of receipt of the information of all errors in any statement, notice, or on your Account, including the identification of any pieceof information you believe may have been altered.

19. Foreign Currency Transactions. Any transactions we conduct involving a foreign currency on your behalf will use a Bank determined foreign exchange rate which will include a spread and may include certain other Fees, such as commissions or other costs that we, our vendors, affiliates, or counterparties may charge in providing or facilitating foreign exchange transactions. The particular rates applied may depend on a variety of factors, including your relationship with the Bank, the type or frequency of transactions, the value of the transactions on an individual or aggregate basis, the type of currency, the date and time of the exchange, and whether the transaction results in a debit or credit to your Account. As the result of the costs to the Bank and the value of the services, these rates may be less favorable than those quoted on the internet.

20. Death or Incompetence of Account Owner or Affecting Signatory Authority. You must notify the Bank immediately upon the death, dissolution, or incompetence of any Account Holder or Authorised Signatory to your Account. After we receive any such notice, whether from you or from other sources, we may freeze the balance of the Account, refuse any transactions, as well as return or otherwise reverse deposits. The Bank may further refuse to release any assets until reasonable documentation is provided verifying or disproving the Account Holder or any Authorised Signatory's death or incompetence, as well as, in the case of such death, dissolution, or incompetence, who is entitled to the assets of the Account. If you die or the entity Account Holder is dissolved while residing outside of Nevis, we may require a personal representative be appointed in a court of competent jurisdiction to manage the Account Holder's interests prior to releasing any assets. Any tax liability arising against the Bank as the result of the death, dissolution, or incompetence of the Account Holder shall be deducted from any transfer out of the Account.

    If you owe any debt to the Bank at the time of your death or dissolution, the Bank shall have the full and absolute right to exercise its right of set off (which is the Bank's right to apply funds in one Account to the debt associated with another Account with the same Account Holder) or security interest rights against any funds credited to your balance after your death or dissolution. These rights shall withstand the rights of any beneficiary of any trust that may have rights to the Account or the property and rights of the Account Holder.

21. Power of Attorney. A power of attorney is a document that you sign authorizing someone else to act on your behalf. In this relationship the person acting on your behalf is your agent. Once

signed, the agent can sign on your behalf and do everything that you could do for your Account, including withdrawing or otherwise spending all of the money in the Account. You should not sign a power of Attorney that grants control over your Account (whether generally or specifically) unless you trust the agent you are appointing to act in your best interests. If you choose to appoint an agent by power of attorney, it must be through a power of attorney form that we agree to accept. We may rely on an original power of attorney and may follow or refuse to follow an agent's requests at any time for any reason, for example if we suspect fraud or abuse of your Account. The Bank shall have no liability arising from its decision to follow or refuse instructions from an agent.

22. Closing Your Account. You or the Bank may close your Account at any time for any reason or no reason and without prior notice to you or the Bank. The Bank is however not required to close any Account under the following circumstances: (a) if you have pending or otherwise unresolved transactions; (b) it is not possible to close, liquidate, or otherwise pay-out the assets held in your Account; (c) where the Account is overdrawn, and; (d) where the Account is subject to legal process initiated in the Island of Nevis. After your Account is closed, we have no obligation to accept deposits, or to otherwise engage in any business with you whatsoever.

23. Use of Information. As a Customer, the Bank appreciates the importance of confidentiality while ensuring compliance with applicable law. As such, the Bank will collect personal information from you only on a as needed basis. All information collected by the Bank is subject to strict confidentiality protections and procedures, including procedural, physical, and electronic safeguards to secure your information from unauthorised use and accidental or unlawful alteration and destruction. We hold our employees accountable for complying with the strictest confidentiality procedures. We will retain copies of information in paper or electronic form at our discretion, and as a general matter, only so long as is necessary to comply with applicable law or as necessary to exercise any legal rights with respect to your relationship with the Bank. You hereby authorise the Bank to use and share your information solely as may be necessary to provide services requested by You, conduct due diligence or otherwise maintain a high standard for the Bank's internal legal, operating, and compliance processes (for example as part of the Bank's ongoing Anti Money Laundering procedures), or as otherwise necessary to comply with the laws of the Island of Nevis or any other jurisdiction in which you or the Bank conducts its business.

24. Disputes Involving Account Control. Should any dispute arise from the provision of conflicting instructions to the Bank from one or more Authorised Signatories, we may freeze the funds until there is a clear resolution from all Authorised Signatories and the Account Holder or from a court of jurisdiction deemed competent by the Bank.

25. Certification of Legal Use of Account. You hereby certify, agree and attest that you shall not use this Account or any other account or relationship with the bank to engage in any illegal conduct or activity, including but not limited to fraud, money laundering, terrorist financing, proliferation of weapons of mass destruction, human or drug trafficking.

26. Restricting the Account. In order to protect you or the Bank, some or all of the services in your Account and any transaction, whether in pending or requested, in your Account may be refused,

frozen, reversed, or delayed for any reason in the Bank's sole discretion.

27. Liability, Indemnification and Customer Instructions. We will not be liable for anything we do when following your instructions or the instructions of your agents. Furthermore, the Bank shall not be liable should it fail to follow your instructions or your agents' instructions so long as the Bank believes that such instructions may expose the Bank to potential losses, civil or criminal liability, or otherwise conflict with any customary banking practice. The Bank will not be liable for indirect, special, or consequential damages regardless of the form of action and even if the Bank has been advised of the possibility of such damages. If the Bank is found at fault by the Nevis court for failing to prevent fraudulent access to your Account by means of any forged Account Holder signature or representation, the Bank's liability, if any, shall be limited to the face amount of the Item. To the extent that there is a discrepancy between your instruction and the Bank's interpretation of that instruction, the Bank's interpretation shall control. You hereby authorize the Bank to accept Account instructions by electronic means and hereby agree to indemnify, defend, and hold the Bank harmless from any losses orclaims arising in connection with your decision to communicate with the Bank through any means, electronic or otherwise.

28. Wealth Management Services. Account Holder has appointed the Bank as its agent and attorney-in-fact to buy and sell securities or other investment products, as well as provide advice, guidance and investment related services for the Account at Account Holder's risk. Account Holder hereby agrees to indemnify and hold the Bank, and its officers, directors, agents, employees and affiliates harmless from all loss, cost, indebtedness and liabilities arising there from. In all such purchases and sales, the Bank is authorized to follow the instructions of the Account Holder in every respect concerning the Account and, except as herein otherwise provided, the Bank is authorized to act for Account Holder in the same manner and with the same force and effect as Account Holder might or could do with respect to such purchases and sales as well as with respect to all other things necessary or incidental thereto, except that the Bank is not authorized to withdraw any money, securities or other property either in the name of Account Holder or otherwise. This authorization is a continuing one and shall remain in full force and effect until terminated in writing. Termination of this authorization shall constitute a material breach of this Agreement by the Account Holder. In no event will the Bank be obligated to affect any transaction for Account Holder which it believes would be violative of any applicable law, rule or regulation, or of the rules or regulations of any regulatory or self-regulatory body. In the event the Account Holder instructs the Bank to purchase, sell, or otherwise modify any investment or financial products for Account Holder's own investment account, Account Holder authorizes the Bank to deduct any and all fees when due from the assets contained in that investment account, including fees charged by any financial advisor to the Bank, and pay them to the such advisor(s) on behalf of Account Holder. The Bank will pay the amount shown to be due on the invoice and will not verify the rate, computation, or timing of the Advisor's fee or the value of the assets used in this connection. Account Holder understands that the Bank and its affiliates may perform, among other things, investment banking, research, brokerage, and investment advisory services for other account holders or clients. Account Holder recognizes that the Bank may give advice and take action in the performance of its duties to other account holders or other clients which may differ from advice given, or in the timing and nature of action taken, with respect to Account Holder. Moreover,

the Bank or any of its affiliates may advise or take action with respect to itself or themselves differently than with respect to Account Holder. Nothing in this Agreement shall be deemed to impose on the Bank any obligation to recommend any investment for purchase or sale, for Account Holder any investment which the Bank may recommend for purchase or sale, for its own account, or for the account of any other account holder or client, nor shall anything on this Agreement be deemed to impose upon the Bank any obligation to give Account Holder the same advice, pricing, or terms of any particular investment as may be given to any other account holders, other clients, itself or third parties. All wealth management and advisory services are offered and sold exclusively by the Bank itself on a direct and private basis to existing customers, and not on behalf of any other financial services providers.

29. No Waiver. The failure by the Bank to enforce any of the rights or terms in pursuant to this Agreement shall not be deemed a waiver of any of those rights or terms. The Bank may still enforce all of its rights under this Agreement, even if it fails to exercise any or all of those rights.

30. Changes to the Agreement. This Agreement, any Fees, or features of your Account, may be updated from time to time at the Bank's discretion and without prior notice to you. The Bank may direct you to its website at www.hrbank.com for the content of any revised Agreement or may publish any revised Agreement through any of the electronic or online services provided by the Bank. By maintaining your Account after the publication of any changes to the Agreement, you agree to those changes.

31. Conflicts. If this Agreement conflicts with any statement or writing made by one of the Bank's employees, this Agreement will govern. To the extent that additional terms and conditions are provided to you for specific services under this Agreement in writing, the additional terms shall control to the extent that they do not conflict with this Bank Customer Agreement. To the extent that any terms of this Agreement may be determined by a court of competent jurisdiction in Nevis to be unenforceable, the unenforceability of such terms shall not affect the validity or effect of the remainder of this Agreement.

32. Merger. The terms of this Agreement along with any account forms or other formal written documentation provided to you by the Bank form one and the same Agreement unlessotherwise stated on, or as a part of, such other documentation, and supersede all prior written or oral agreements between you and the Bank. In the event of any dispute arising from any subsequent or contemporaneous communications, forms, or agreements between you and the Bank, regardless of the language of those communications, forms or agreements, this Agreement shall control.

33. Agreement to Arbitrate. In the event of a dispute arising out of or relating to this contract, including any question regarding its existence, validity or termination, the parties shall first seek settlement of that dispute by mediation with a mediator selected by the Bank. If the dispute is not settled by mediation within 120 days of the appointment of the mediator, or such further period as the parties shall agree in writing, the dispute shall be referred to and finally resolved by arbitration by an arbitrator selected by the parties and subject to the law and rules of procedure of the courts of Nevis, which rules are deemed to be incorporated by reference into

this clause. The language to be used in the mediation and in the arbitration shall be English. The number of arbitrators shall be three and the seat, or legal place, of arbitration shall be Charlestown, Nevis. You irrevocably waive, to the fullest extent permitted by law, all right to a public trial in any action, proceeding, and with respect to any claim of any kind whatsoever relating thereto, including but not limited to any counter claim, action sounding in tort, fraud, or otherwise, arising or related in any way to your relationship with the Bank.

34. Choice of Law and Forum. In the sole event that the Agreement to arbitrate contained in this Agreement is or becomes unenforceable, you hereby agree and irrevocably consent that your Account and relationship with the Bank shall be governed and construed exclusively by the laws and subject to the exclusive jurisdiction of Nevis, without regard to any conflict of law provision or consideration that may otherwise be applicable. For the avoidance of doubt, the arbitration clause of this Agreement shall govern all claims and disputes arising in connection with your Account and relationship with the Bank unless it is determined to be unenforceable as a matter of law.

35. Assignment and Successors. This Agreement shall be binding on your personal representative, executors, administrators. You may not assign, transfer, grant any security interest in or otherwise hypothecate, this Agreement without the Bank's prior written consent. Even with the Bank's prior written consent, no assignment of this Agreement will be valid or binding on the Bank, unless the Bank at its discretion records such approval of the assignment in our records and provides you with certified notice of that record.

36. Referrals. Upon request, our employees may provide contact information for third parties, including lawyers, accountants, or contractors who offer products and services not offered by the Bank. Some of these third parties may be Bank customers. While such referrals or information are provided solely as a courtesy to you and the third party, we or our affiliates may be compensated for referrals that we provide. The Bank makes no representations, and expressly disclaims all warranties, regarding the services or products of any third parties that we refer. If you decide to do business with a party referred to by the Bank, that decision is yoursalone and the Bank is not responsible for the third-party's performance, conduct, or to assist inthe resolution of any disputes between you and the third-party.

37. Execution and Modification by Conduct. You agree that the submission to the Bank of any Account Application by you or any agent acting on your behalf, the initial or continued use of any Account provided by the Bank, or use of the banking, investment, or other financial or non-financial services generally providedby the Bank to You, shall constitute conclusive proof that you, as well as any owner or party having control of your Account, agree to the terms and conditions of this Agreement which terms cover the entirety of your past, present, and future relationship with the bank and supersede any applicable terms and conditions. Furthermore, you agree to be legally bound and obligated by any action taken by one or more authorized signatories to your Account. As such, Account Holder(s) and Authorized Signer(s) named in the Account Application hereby certify and attest that I/we am/are the natural person(s) who is/are applying to open this Account with Hamilton Reserve Bank Ltd. ("HRB"), and that I/we hereby represent and attest that: (i) I/we will not use the services of HRB for any unlawful activity or purpose; (ii) I/we have read, understand, and agree to this Hamilton Reserve Bank

Ltd. Customer Account Agreement; (iii) all information that I/we have provided to HRB is true, accurate and complete; (iv) I/we will notify HRB immediately of any material changes to the information contained in this application, and; (v) I/we authorize HRB to be an information processor and make initial and ongoing credit and other inquiries with third-parties in connection with my/our Account for purposes of compliance with applicable law and the provision of financial services. (End of Agreement. Customer consent page follows.)

HAMILTON RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** Hart Violet, LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Hart Violet, LLC

*Signature*

Date: 24 May 2025

Additional Authorized Signer ("You"):

Name: Anne Huelgas

Title: Chief Financial Officer of Hart Viole

*Signature*

Date: 24 May 2025

Additional Authorized Signer ("You"):

Name:

Title:

*Signature*

Date:

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

## CORPORATE OWNERSHIP STATEMENT OF NQ RECEIVABLE HOLDINGS, LLC

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rules 1010-1 and 7007.1-1 of the Local Bankruptcy Rules for the Southern District of New York, petitioner NQ Receivable Holdings, LLC (f/k/a Hart Violet, LLC) (the "Petitioner"), states that it is a limited liability company organized under the laws of Wyoming. NextQuant Capital LLC, a Wyoming limited liability company, owns 100% of the Petitioner's equity interests.

**Declaration Under Penalty of Perjury**

I, the undersigned authorized representative of NextQuant Management LLC, as manager of the Petitioner, declare under penalty of perjury that I have reviewed the "Corporate Ownership Statement" and that it is true and correct to the best of my knowledge, information and belief, with reliance on appropriate corporate officers.

Dated: November 13, 2026

By: /s/ *Bryan Del Plazo*
Bryan Del Plazo
*Authorized Signatory of NextQuant Management LLC, as manager of NQ Receivable Holdings, LLC*

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

**DECLARATION OF LIGHTHOUSE MANAGEMENT SERVICES, LLC, AS MANAGER OF LSPG LONG-TERM STRATEGIES, LLC, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003(A)**

Pursuant to 28 U.S.C. § 1746, Harald Linhart declares as follows:

1. I make this declaration (the "Declaration") on behalf of Lighthouse Management Services, LLC ("Lighthouse"), as manager of LSPG Long-Term Strategies, LLC (the "Petitioning Creditor"), in the above-captioned involuntary chapter 11 case (the "Bankruptcy Case") filed by the Petitioning Creditor and other petitioning creditors against Hamilton Reserve Bank Ltd. (the "Debtor"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to the Petitioning Creditor's claims against the Debtor. If called to testify in connection with the Bankruptcy Case, the following would constitute my testimony.

2. I am the General Manager of Lighthouse, the manager of the Petitioning Creditor.

3. The Petitioning Creditor holds claims against the Debtor based on the Debtor's refusal to honor withdrawal requests from a USD deposit account maintained with the Debtor (the "Deposit Account"). As of the date of this Declaration, the Deposit Account reflected a balance of $175,360.81, per the Debtor's online banking system.

4. The Petitioning Creditor's claims arise from the Debtor's failure to honor the Petitioning Creditor's instructions to withdraw and transfer funds held by the Debtor in the Deposit Account. On June 17, 2026, the Petitioning Creditor sent a written request to the Debtor to make a transfer out of its Deposit Account, which the Debtor never executed. Thereafter, the Petitioning Creditor sent approximately four additional transfer requests that the Debtor (i) refused to honor, in whole or in part, (ii) failed to respond to, or (iii) left pending with no additional information.

5. The Petitioning Creditor's claims arising from the Deposit Account, including any accrued but unpaid interest thereon, plus applicable fees, costs, and other charges, are being relied upon for the purpose of satisfying the requirements of 11 U.S.C. § 303(b)(1) and were acquired on June 14, 2024, pursuant to that certain Customer Account Agreement attached hereto.

6. The Petitioning Creditor may also hold other claims against the Debtor based upon other accounts, deposits, securities, or debt instruments of the Debtor.

7. The Petitioning Creditor made deposits into the Deposit Account in the ordinary course of its banking relationship with the Debtor and not for the purpose of commencing the Bankruptcy Case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of November, 2026.

By: /s/ *Harald Linhart*
Harald Linhart
*General Manager of Lighthouse Management Services, LLC as manager of LSPG Long-Term Strategies, LLC*

HAMILTON RESERVE BANK

# Account Statement

ACCOUNT HOLDER
**LSPG LONG-TERM STRATEGIES, LLC**

ADDRESS
SUITE 1, AUTHUR EVELYN BUILDING, CHARLESTOWN, Saint Kitts and Nevis

PERIOD
14/May/2026 — 13/Nov/2026

GENERATED ON
13/Nov/2026, 07:37 PM

## LSPG LONG-TERM STRATEGIES, LLC · 0010000021011

ACCOUNT NAME
**LSPG LONG-TERM STRATEGIES, LLC**

ACCOUNT NUMBER
[redacted]**1011**

ACCOUNT TYPE
Corporate Savings Account

CURRENCY
USD

| DATE | DESCRIPTION | BENEFICIARY | TRANSACTION ID | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|---|
| 29/Sep/2026 | **Certified Bank Statement Fee** | | CHG2627254224 | -4,800.00 | | 175,360.81 |
| 02/Sep/2026 | **Outgoing wire fee** | | AAACT26245CM2LNLKM | -350.00 | | 180,160.81 |
| 02/Sep/2026 | **For Further Credit to Jojo Limited Partnership Account 85472299** | Charles Schwab and Co Inc · 40607595 | PI2624406Y05N4JP | -25,000.00 | | 180,510.81 |
| 28/Aug/2026 | **Outgoing wire fee** | | AAACT26240GVSLGWR8 | -350.00 | | 205,510.81 |
| 28/Aug/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI262400TR0K3ZY3 | -100,000.00 | | 205,860.81 |
| 31/Jul/2026 | **Outgoing wire fee** | | AAACT26212580RJXJK | -350.00 | | 305,860.81 |
| 31/Jul/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2619004NK756MF | -100,000.00 | | 306,210.81 |
| 30/Jul/2026 | **Outgoing wire fee** | | AAACT2621165S5TJGJ | -350.00 | | 406,210.81 |

| | | | | | |
|---|---|---|---|---|---|
| 30/Jul/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2619012S3RCWYC | -100,000.00 | 406,560.81 |
| 21/Jul/2026 | **Outgoing wire fee** | | AAACT262024TFWL7KB | -350.00 | 506,560.81 |
| 21/Jul/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI26190004B84HN0 | -100,000.00 | 506,910.81 |
| 14/Jul/2026 | **Outgoing wire fee** | | AAACT261953MZ5RCHS | -350.00 | 606,910.81 |
| 14/Jul/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI26190004B845VS | -100,000.00 | 607,260.81 |
| 25/Jun/2026 | **Outgoing wire fee** | | AAACT26176TGKN3MD4 | -350.00 | 707,260.81 |
| 25/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI26169057367RP9 | -100,000.00 | 707,610.81 |
| 25/Jun/2026 | **Outgoing wire fee** | | AAACT26176TGKN30FY | -350.00 | 807,610.81 |
| 25/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI26169057367HGG | -100,000.00 | 807,960.81 |
| 24/Jun/2026 | **Outgoing wire fee** | | AAACT26175FT5CL09Z | -350.00 | 907,960.81 |
| 24/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261690573677BV | -100,000.00 | 908,310.81 |
| 22/Jun/2026 | **Outgoing wire fee** | | AAACT261730R4LRW2F | -350.00 | 1,008,310.81 |
| 22/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI26169057366XS2 | -100,000.00 | 1,008,660.81 |
| 18/Jun/2026 | **Outgoing wire fee** | | AAACT26169G37KC5HQ | -350.00 | 1,108,660.81 |
| 18/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261460WKHWYTRL | -100,000.00 | 1,109,010.81 |
| 17/Jun/2026 | **Outgoing wire fee** | | AAACT26168XK6GB0V0 | -350.00 | 1,209,010.81 |
| 17/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2616205SKZ6XWG | -100,000.00 | 1,209,360.81 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 17/Jun/2026 | **Outgoing wire fee** | | AAACT26168XK6G2H72 | -350.00 | | 1,309,360.81 |
| 17/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261620PXMNC14V | -100,000.00 | | 1,309,710.81 |
| 16/Jun/2026 | **Outgoing wire fee** | | AAACT261675JP1B43C | -350.00 | | 1,409,710.81 |
| 16/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261620PXMNCTDH | -100,000.00 | | 1,410,060.81 |
| 15/Jun/2026 | **Outgoing wire fee** | | AAACT26166W4XV4K6Q | -350.00 | | 1,510,060.81 |
| 15/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2616205SKZ7HP2 | -100,000.00 | | 1,510,410.81 |
| 15/Jun/2026 | **Outgoing wire fee** | | AAACT26166W4XTZGS2 | -350.00 | | 1,610,410.81 |
| 15/Jun/2026 | **Management Fees for second quarter 2026** | Lighthouse Management HK Limited · 390204737 | PI261630BWZXD3F8 | -39,173.99 | | 1,610,760.81 |
| 12/Jun/2026 | **Outgoing wire fee** | | AAACT26163JT64YKZ4 | -350.00 | | 1,649,934.80 |
| 12/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261460WKHWZ1Y5 | -100,000.00 | | 1,650,284.80 |
| 12/Jun/2026 | **Outgoing wire fee** | | AAACT261631JKW9G1H | -350.00 | | 1,750,284.80 |
| 12/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261460SVC0Q9FJ | -100,000.00 | | 1,750,634.80 |
| 11/Jun/2026 | **Outgoing wire fee** | | AAACT26162BWBQM25V | -350.00 | | 1,850,634.80 |
| 11/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2616205SKZ616D | -100,000.00 | | 1,850,984.80 |
| 10/Jun/2026 | **WIRE RETURN, VD 4 JUN 26 B/O CHARLES SCHWAB AND CO INC TRN REF: BNK261530KMGLKH0** | | DC261610001002002 | | 100,000.00 | 1,950,984.80 |
| 10/Jun/2026 | **Return Wire Fee** | | CHG2615687017 | -100.00 | | 1,850,984.80 |
| 04/Jun/2026 | **Outgoing wire fee** | | AAACT26155VKFZ7G1T | -350.00 | | 1,851,084.80 |

| | | | | | |
|---|---|---|---|---|---|
| 04/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · ••••8930 | PI261531429DMD5W | -100,000.00 | 1,851,434.80 |
| 02/Jun/2026 | **Outgoing wire fee** | | AAACT261533S1ZGQ2S | -350.00 | 1,951,434.80 |
| 02/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261460SVC0PKBD | -100,000.00 | 1,951,784.80 |
| 01/Jun/2026 | **Outgoing wire fee** | | AAACT26152BB5DHP44 | -350.00 | 2,051,784.80 |
| 01/Jun/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261460WKHWY9JC | -100,000.00 | 2,052,134.80 |
| 27/May/2026 | **Outgoing wire fee** | | AAACT26147HY3SVCM4 | -350.00 | 2,152,134.80 |
| 27/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2612514HQ8SCSD | -100,000.00 | 2,152,484.80 |
| 26/May/2026 | **Outgoing wire fee** | | AAACT2614663TDWW20 | -350.00 | 2,252,484.80 |
| 26/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261250VW8FF58C | -100,000.00 | 2,252,834.80 |
| 20/May/2026 | **Outgoing wire fee** | | AAACT261406JWL75RX | -350.00 | 2,352,834.80 |
| 20/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2612514HQ8RVK4 | -100,000.00 | 2,353,184.80 |
| 19/May/2026 | **Outgoing wire fee** | | AAACT26139GG1W8S9S | -350.00 | 2,453,184.80 |
| 19/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261250VW8FDMJ0 | -100,000.00 | 2,453,534.80 |
| 15/May/2026 | **Outgoing wire fee** | | AAACT26135ZMJXYG7P | -350.00 | 2,553,534.80 |
| 15/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI2612514HQ8R98P | -100,000.00 | 2,553,884.80 |
| 14/May/2026 | **Outgoing wire fee** | | AAACT26134J10XBPWX | -350.00 | 2,653,884.80 |
| 14/May/2026 | **For Further Credit to Mala Rokada LP Account 83765374** | Charles Schwab and Co Inc · 40607595 | PI261250LL5FFJGS | -100,000.00 | 2,654,234.80 |

| AVAILABLE BALANCE AS OF 13/NOV/2026 | USD 175,360.81 |
| --- | --- |

# HAMILTON RESERVE BANK LTD.
# CUSTOMER ACCOUNT AGREEMENT
**Effective: September 6, 2021**

The words "you," "your," "account holder," and "Customer" mean the person or legal entity that has submitted an account application (hereinafter an "Account Application") to or opened an Account with the Bank, as well as all signatories on any Bank documentation.

The words "Bank," "we," "our," and "us" mean *Hamilton Reserve Bank Ltd.*, a bank chartered under the laws and governance of the Island of Nevis of the Federation of St. Kitts & Nevis, as well as any Bank affiliates or partners.

This is your customer agreement with the Bank (the "Agreement"). The Bank will provide you with additional agreements and documentation throughout our relationship with you which are part of this Agreement. As such, this Agreement includes:

(a) the terms and conditions governing all activity in relation to the existence and operation of your deposit accounts with the Bank.

(b) those certain additional terms and conditions that the Bank provides to you in writing prior to approving your account to utilize a particular banking service or facility including any account opening forms.

(c) all interests and Fees charged by the Bank, the benefits we supply to you, ourselves, and the terms and conditions of this Agreement, as well as any additional documentation we may provide to you from time to time.

To the extent that the Bank provides you with more specific terms and conditions regarding your Account and relationship with the Bank, those terms and conditions shall supersede those described below. Your use of a credit card offered through the Bank is not controlled by this Agreement and is instead governed by a separate agreement that is provided upon an application for a Bank issued credit card.

## DEFINITIONS

The following are definitions of some of the key terms used in this Agreement:

a. "**Account**" means any account that accepts deposits regardless of currency or asset type thatis covered by this Agreement.

b. "**Account Holder**" means the individual or business entity owning the Account**.**

c. "**Authorised Signatory**" means any signatory to an Account Application.

d. "**Available Balance**" means the balance in your Account excluding any pending credit or

debit transactions or amounts that are not available for withdrawal pursuant to the Bank Funds Availability Policy (defined below), that we are otherwise legally obligated to pay.

e. "**Business Day**" means every day except Saturdays, Sundays, and certain Bank Holidays. Depending on the particular Bank service provided, certain business operations may be unavailable from time to time due to local bank holidays in the United States, the United Kingdom, and India.

f. "**Business Hours**" means the hours between 8:00AM and 4:00PM (Eastern Standard Time) on any Business Day.

g. "**Funds Availability Policy**" means a policy kept at the discretion of the Bank and includes a variety of factors relating to the availability of funds in an Account. While the availability of funds shall always remain subject to the Bank's unencumbered and sole discretion, it is informed by those various legal and financial risks particular to your Account. For further detail on how this policy may affect your Account, please inquire directly with Bank management.

h. "**Item**" means any ACH, wire, funds transfer, ATM withdrawal, debit or credit card purchase, Fee, charge, or other amount that is added to, or subtracted from, the balance of assets in your Account.

## ACCOUNTS & SERVICES

1. Account Opening Forms. Every person or entity opening an Account must complete a new Account Application in order to establish a basic deposit account as well as any other documentation required by the Bank in connection with additional services you use that are provided by the Bank.

2. Who Can Open Accounts with the Bank. Accounts may be opened by individuals and legal entities around the world, subject to compliance review and approval. You agree that the Bank may decline to open an Account for any reason.

3. Business Accounts. If you have opened your Account as a "Business Account" using the Business Account Application or any other documentation we have provided to you, you agree not to use the Account for personal purposes. Unless otherwise described in Bank Documentation, a "Business" or "Business Organization" shall be a corporate, limited liability company, limited company, or other legal entity formed under the laws of the jurisdiction of its formation, any governmental organization, or validly created trust. We may rely on the accuracy and authority of any and all Business resolutions, signatures, certificates of incorporation, by-laws, operating agreements, trusts, authorisations, resolutions, or other documentation provided to us, or that we request in connection with any Business Account.

4. Additional Documentation. You must also complete or provide any other documentation we may require from time to time. We will conduct due diligence in our discretion on each Account Holder and Authorised Signatory prior to the time an Account is opened. We may rely upon the documentation we have in our files regarding the identity of the Authorised

Signatories on your Account until you present appropriate documentation identifying other Authorised Signatories. If we do not obtain the information we need under our customer identification program, we reserve the right to prevent you from accessing the funds in your Account until we obtain that information, and you agree we will not be liable to you if any payment order is not paid during this time. Subject to our anti money laundering and counter terrorist financing program requirements, we will tell you in writing if we take this action.

5. Powers of Authorised Signatory to modify Account Information. No Authorised Signatory may remove or add the name of another Authorised Signatory unless the resolutions designating the Authorised Signatories specifically permit that Authorised Signatory to do so.

6. Making Deposits. You may make an electronic deposit into your Account in person at any of our branch offices, through another financial institution, or by any other physical or electronic method we make available. The Bank does not currently issue or accept cheques or accept cash deposits. We may refuse a deposit, limit the amount of a deposit, or return all or a portion of a deposit. When the Bank receives an electronic deposit to your account, the only affirmative notice you will receive from us is on your next statement. You may login to any online banking account provided by the Bank to check your balance and deposits at any time so long as that Account has been set up by you and the Bank. You may also call the Bank during regular Business Hours to confirm that we have received a deposit. Any telephone communication with Bank personnel will be subject to reasonable security procedures which you agree may be implemented subject to the sole discretion of the Bank. If the bank or other party that sent an electronic deposit to your Account advises the Bank that the transfer was made in error, or was intended for another customer or account, the Bank may immediately deduct the transferred amount from your balance without conducting an investigation into the claim of error.

7. Right to Refuse Deposits. We are not responsible for any deposit you send to us that we do not receive. All deposits to your Accounts, regardless of how made, are subject to verification, final payment, and our Funds Availability Policy. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. The Bank does not accept cash deposits and shall have no obligation whatsoever to hold, maintain, or return any cash deposit received by mail or in person.

8. Correspondent and Financial Agents. In order to provide you with the best service, the Bank may use the services of certain correspondent banks, financial entities and institutions, banking software providers, as well as digital services companies and common carriers (“Banking Agents”), as well certain funds transfer methods and account systems provided as part of the services provided by such Banking Agents in order to provide services to you under this Agreement. You agree that any Banking Agent shall be your agent with actual authority to act on your behalf in providing any banking services. As such, the Bank shall not be liable to you by reason of: (i) any act or omission by a Banking Agent that is beyond the reasonable control of the Bank, or; (ii) the loss, diminution, or destruction of any funds, security, certificate, document, or asset of any kind while in transit or custody of any Banking Agent, or while under the possession, custody, or control of a person or entity other than the Bank.

9. Calculating Interest in Your Account. The Bank may or may not pay interest on your account at the Bank's sole discretion. If interest is paid, you must be notified by the Bank in writing. The interest rate of interest accruing in your account (the annualpercentage yield or ("APY") on all interest-bearing checking, savings, brokerage, money market savings, or other Accounts may change at any time after the Account is opened. The interest rate and APY may be changed by the Bank as often as we choose, without limits and without notice. The Bank calculates interest on Accounts utilizing the daily balance method, applying a daily periodic rate to the available principal balance in your Account each day. Asa general matter, interest in your Account is calculated based on the assumption of a 365-day year. Deposits in Your Account will begin to accrue interest on the Business Day that the fundsare included under your Available Balance. Earned interest shall be paid to you by crediting the amount of the accrued interest to your Account. If you close your Account before interest is credited, we shall not be obligated to pay you that interest.

10. Withdrawals. Notwithstanding a more specific agreement with the Bank in relation to a particular Bank service or facility, Assets from your Account generally may be withdrawn three business days after they have cleared in your Account. The availability of funds in your Account to withdraw does not mean the deposit made in your Account is "good," has "cleared" or has been paid by the paying financial institution. As a general matter, and except as otherwise provided in the Agreement, you may make withdrawals from your Account up to the amount of the Available Balance using any means or method that the Bank makes available to you. We may require two forms of identification for any withdrawals or transfers out of your Account to be presented at any branch office of the Bank. We may also contact you electronically through electronic means or directly by phone to confirm your identity and verify your authorization to conduct the withdrawal. While we reserve the right to refuse a withdrawal request exceeding the available funds in your Account (even in the case of deposit made by you later in the Business Day after a withdrawal request is refused) the Bank will endeavor to make your assets available to you as promptly as possible within its discretion and the parameters of its Funds Availability Policy. For information about when funds from a deposit become available and you can withdraw them, please see the Definitions Section of the Agreement, or inquire directly with Bank management regarding the Bank Funds Availability Policy.

11. Refusal of Withdrawals. Before allowing funds to be withdrawn from your Account, we may request that you provide us with certain confirmations, identification, authorisations, documentation, or other information that the Bank determines to be necessary in its sole and absolute discretion. You acknowledge that your refusal to comply with any such request may result in the Bank's refusal to allow the withdrawal. The Bank is not required to notify you in advance if it will seek additional information prior to allowing a withdrawal from your Account.

12. Multiple Signature Requirements. If you elect to require multiple signatures in order to conduct business in your Account, this requirement will be strictly enforced by the Bank.

13. Minimum Account Balance. The Bank may require a minimum Account opening balance or equivalent value in addition to related Fees per Personal or Business Account. Should your Account opening balance fall below these minimum balances, you will receive a notice of the

deficiency. The Bank has the right in its sole discretion to close Accountsor reject Account applications for Accounts that fall below, or would not meet, the minimum required Account opening balances. The Bank may charge Fees against your Account so longas they remain under the minimum required opening balance.

14. Insufficient Balance on Withdrawal. If your available balance is not enough to pay a transaction you make and we pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Paid Fee. If we do not pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Returned Fee. In either case, additional Fees may also be charged to your Account.

15. Fees. You agree to pay any fees, charges, or other costs (collectively referred to herein as "Fees") applied to your Account from the balance of your Account, even if that balance may be negative. The Bank may apply Fees to your Account for those amounts, purposes, and with any frequency, it deemsappropriate in its sole discretion. Moreover, the Bank may apply different Fees by reason of, among other things, the amount of funds or assets held in a given Account or Accounts, the services provided to an Account Holder, as well as the Account Holder's relationship with theBank. Such Fees may be applied and changed without prior notice to you and will be reflected inyour monthly statements. For more information on specific Fees and charges applied by theBank to your Account, please contact your Bank relationship manager or, as available, submita question through the Bank's secure customer portal online. While the Bank shall not be required to provide you with any particular Fee schedule, any schedule of Fees provided to youin writing shall be deemed a part of this Agreement.

16. Online Account Availability**:** Subject to the availability of any of the Bank's information technology providers and telecommunications carriers, or as necessary for the Bank to conduct maintenance or upgrades to the software or the Bank's online services, Access to any online banking services made available by the Bank will be generally available 24 hours a day and 7 days a week. As the Bank relies on various software and telecommunications systems, the Bank shall only be responsible for that information which its staff receives and shall not be liable to Account Holder for any disruptions, unavailability, or errors arising from of one or more aspects of any software if such software was implemented or is serviced by third parties.

17. Account Statements and Account Notices. All Account statements and notices will be made available to you exclusively and electronically through the Bank's online banking services and/or secure login messaging center. The Bank does not mail physical account statements or offer mail holding services. You agree that it is your responsibility to sign up for, and regularly monitor, your online account. The Bank shall not be liable for any losses that arise in your Account as the result of your failure to monitor your account or respond to Bank notice regarding your Account. Statements of your Account shall be made available online on a monthly basis and will reflect activity in your Account occurring subsequent to your last statement. Your statement shall be deemed delivered to you at the time it becomes available to you through the Bank's online banking systems. One signatory to the Account will be provided access to the online banking systems and is solely responsible for conveying all statements and notices to the Account Holder.

18. Your Obligation to Review Account Statements. You have an affirmative obligation to review all Account statements and notices online and to immediately notify the Bank of any errors in those statements or notices. Your obligation to review your Account information generally also includes:

    (a) Examining all activity in your Account and statements on a prompt and regularbasis.

    (b) Notifying the Bank within three (3) days of receipt of the information of all errors in any statement, notice, or on your Account, including the identification of any pieceof information you believe may have been altered.

19. Foreign Currency Transactions. Any transactions we conduct involving a foreign currency on your behalf will use a Bank determined foreign exchange rate which will include a spread and may include certain other Fees, such as commissions or other costs that we, our vendors, affiliates, or counterparties may charge in providing or facilitating foreign exchange transactions. The particular rates applied may depend on a variety of factors, including your relationship with the Bank, the type or frequency of transactions, the value of the transactions on an individual or aggregate basis, the type of currency, the date and time of the exchange, and whether the transaction results in a debit or credit to your Account. As the result of the costs to the Bank and the value of the services, these rates may be less favorable than those quoted on the internet.

20. Death or Incompetence of Account Owner or Affecting Signatory Authority. You must notify the Bank immediately upon the death, dissolution, or incompetence of any Account Holder or Authorised Signatory to your Account. After we receive any such notice, whether from you or from other sources, we may freeze the balance of the Account, refuse any transactions, as well as return or otherwise reverse deposits. The Bank may further refuse to release any assets until reasonable documentation is provided verifying or disproving the Account Holder or any Authorised Signatory's death or incompetence, as well as, in the case of such death, dissolution, or incompetence, who is entitled to the assets of the Account. If you die or the entity Account Holder is dissolved while residing outside of Nevis, we may require a personal representative be appointed in a court of competent jurisdiction to manage the Account Holder's interests prior to releasing any assets. Any tax liability arising against the Bank as the result of the death, dissolution, or incompetence of the Account Holder shall be deducted from any transfer out of the Account.

    If you owe any debt to the Bank at the time of your death or dissolution, the Bank shall have the full and absolute right to exercise its right of set off (which is the Bank's right to apply funds in one Account to the debt associated with another Account with the same Account Holder) or security interest rights against any funds credited to your balance after your death or dissolution. These rights shall withstand the rights of any beneficiary of any trust that may have rights to the Account or the property and rights of the Account Holder.

21. Power of Attorney. A power of attorney is a document that you sign authorizing someone else to act on your behalf. In this relationship the person acting on your behalf is your agent. Once

signed, the agent can sign on your behalf and do everything that you could do for your Account, including withdrawing or otherwise spending all of the money in the Account. You should not sign a power of Attorney that grants control over your Account (whether generally or specifically) unless you trust the agent you are appointing to act in your best interests. If you choose to appoint an agent by power of attorney, it must be through a power of attorney form that we agree to accept. We may rely on an original power of attorney and may follow or refuse to follow an agent's requests at any time for any reason, for example if we suspect fraud or abuse of your Account. The Bank shall have no liability arising from its decision to follow or refuse instructions from an agent.

22. Closing Your Account. You or the Bank may close your Account at any time for any reason or no reason and without prior notice to you or the Bank. The Bank is however not required to close any Account under the following circumstances: (a) if you have pending or otherwise unresolved transactions; (b) it is not possible to close, liquidate, or otherwise pay-out the assets held in your Account; (c) where the Account is overdrawn, and; (d) where the Account is subject to legal process initiated in the Island of Nevis. After your Account is closed, we have no obligation to accept deposits, or to otherwise engage in any business with you whatsoever.

23. Use of Information. As a Customer, the Bank appreciates the importance of confidentiality while ensuring compliance with applicable law. As such, the Bank will collect personal information from you only on a as needed basis. All information collected by the Bank is subject to strict confidentiality protections and procedures, including procedural, physical, and electronic safeguards to secure your information from unauthorised use and accidental or unlawful alteration and destruction. We hold our employees accountable for complying with the strictest confidentiality procedures. We will retain copies of information in paper or electronic form at our discretion, and as a general matter, only so long as is necessary to comply with applicable law or as necessary to exercise any legal rights with respect to your relationship with the Bank. You hereby authorise the Bank to use and share your information solely as may be necessary to provide services requested by You, conduct due diligence or otherwise maintain a high standard for the Bank's internal legal, operating, and compliance processes (for example as part of the Bank's ongoing Anti Money Laundering procedures), or as otherwise necessary to comply with the laws of the Island of Nevis or any other jurisdiction in which you or the Bank conducts its business.

24. Disputes Involving Account Control. Should any dispute arise from the provision of conflicting instructions to the Bank from one or more Authorised Signatories, we may freeze the funds until there is a clear resolution from all Authorised Signatories and the Account Holder or from a court of jurisdiction deemed competent by the Bank.

25. Certification of Legal Use of Account. You hereby certify, agree and attest that you shall not use this Account or any other account or relationship with the bank to engage in any illegal conduct or activity, including but not limited to fraud, money laundering, terrorist financing, proliferation of weapons of mass destruction, human or drug trafficking.

26. Restricting the Account. In order to protect you or the Bank, some or all of the services in your Account and any transaction, whether in pending or requested, in your Account may be refused,

frozen, reversed, or delayed for any reason in the Bank's sole discretion.

27. Liability, Indemnification and Customer Instructions. We will not be liable for anything we do when following your instructions or the instructions of your agents. Furthermore, the Bank shall not be liable should it fail to follow your instructions or your agents' instructions so long as the Bank believes that such instructions may expose the Bank to potential losses, civil or criminal liability, or otherwise conflict with any customary banking practice. The Bank will not be liable for indirect, special, or consequential damages regardless of the form of action and even if the Bank has been advised of the possibility of such damages. If the Bank is found at fault by the Nevis court for failing to prevent fraudulent access to your Account by means of any forged Account Holder signature or representation, the Bank's liability, if any, shall be limited to the face amount of the Item. To the extent that there is a discrepancy between your instruction and the Bank's interpretation of that instruction, the Bank's interpretation shall control. You hereby authorize the Bank to accept Account instructions by electronic means and hereby agree to indemnify, defend, and hold the Bank harmless from any losses orclaims arising in connection with your decision to communicate with the Bank through any means, electronic or otherwise.

28. Wealth Management Services. Account Holder has appointed the Bank as its agent and attorney-in-fact to buy and sell securities or other investment products, as well as provide advice, guidance and investment related services for the Account at Account Holder's risk. Account Holder hereby agrees to indemnify and hold the Bank, and its officers, directors, agents, employees and affiliates harmless from all loss, cost, indebtedness and liabilities arising there from. In all such purchases and sales, the Bank is authorized to follow the instructions of the Account Holder in every respect concerning the Account and, except as herein otherwise provided, the Bank is authorized to act for Account Holder in the same manner and with the same force and effect as Account Holder might or could do with respect to such purchases and sales as well as with respect to all other things necessary or incidental thereto, except that the Bank is not authorized to withdraw any money, securities or other property either in the name of Account Holder or otherwise. This authorization is a continuing one and shall remain in full force and effect until terminated in writing. Termination of this authorization shall constitute a material breach of this Agreement by the Account Holder. In no event will the Bank be obligated to affect any transaction for Account Holder which it believes would be violative of any applicable law, rule or regulation, or of the rules or regulations of any regulatory or self-regulatory body. In the event the Account Holder instructs the Bank to purchase, sell, or otherwise modify any investment or financial products for Account Holder's own investment account, Account Holder authorizes the Bank to deduct any and all fees when due from the assets contained in that investment account, including fees charged by any financial advisor to the Bank, and pay them to the such advisor(s) on behalf of Account Holder. The Bank will pay the amount shown to be due on the invoice and will not verify the rate, computation, or timing of the Advisor's fee or the value of the assets used in this connection. Account Holder understands that the Bank and its affiliates may perform, among other things, investment banking, research, brokerage, and investment advisory services for other account holders or clients. Account Holder recognizes that the Bank may give advice and take action in the performance of its duties to other account holders or other clients which may differ from advice given, or in the timing and nature of action taken, with respect to Account Holder. Moreover,

the Bank or any of its affiliates may advise or take action with respect to itself or themselves differently than with respect to Account Holder. Nothing in this Agreement shall be deemed to impose on the Bank any obligation to recommend any investment for purchase or sale, for Account Holder any investment which the Bank may recommend for purchase or sale, for its own account, or for the account of any other account holder or client, nor shall anything on this Agreement be deemed to impose upon the Bank any obligation to give Account Holder the same advice, pricing, or terms of any particular investment as may be given to any other account holders, other clients, itself or third parties. All wealth management and advisory services are offered and sold exclusively by the Bank itself on a direct and private basis to existing customers, and not on behalf of any other financial services providers.

29. No Waiver. The failure by the Bank to enforce any of the rights or terms in pursuant to this Agreement shall not be deemed a waiver of any of those rights or terms. The Bank may still enforce all of its rights under this Agreement, even if it fails to exercise any or all of those rights.

30. Changes to the Agreement. This Agreement, any Fees, or features of your Account, may be updated from time to time at the Bank's discretion and without prior notice to you. The Bank may direct you to its website at www.hrbank.com for the content of any revised Agreement or may publish any revised Agreement through any of the electronic or online services provided by the Bank. By maintaining your Account after the publication of any changes to the Agreement, you agree to those changes.

31. Conflicts. If this Agreement conflicts with any statement or writing made by one of the Bank's employees, this Agreement will govern. To the extent that additional terms and conditions are provided to you for specific services under this Agreement in writing, the additional terms shall control to the extent that they do not conflict with this Bank Customer Agreement. To the extent that any terms of this Agreement may be determined by a court of competent jurisdiction in Nevis to be unenforceable, the unenforceability of such terms shall not affect the validity or effect of the remainder of this Agreement.

32. Merger. The terms of this Agreement along with any account forms or other formal written documentation provided to you by the Bank form one and the same Agreement unlessotherwise stated on, or as a part of, such other documentation, and supersede all prior written or oral agreements between you and the Bank. In the event of any dispute arising from any subsequent or contemporaneous communications, forms, or agreements between you and the Bank, regardless of the language of those communications, forms or agreements, this Agreement shall control.

33. Agreement to Arbitrate. In the event of a dispute arising out of or relating to this contract, including any question regarding its existence, validity or termination, the parties shall first seek settlement of that dispute by mediation with a mediator selected by the Bank. If the dispute is not settled by mediation within 120 days of the appointment of the mediator, or such further period as the parties shall agree in writing, the dispute shall be referred to and finally resolved by arbitration by an arbitrator selected by the parties and subject to the law and rules of procedure of the courts of Nevis, which rules are deemed to be incorporated by reference into

this clause. The language to be used in the mediation and in the arbitration shall be English. The number of arbitrators shall be three and the seat, or legal place, of arbitration shall be Charlestown, Nevis. You irrevocably waive, to the fullest extent permitted by law, all right to a public trial in any action, proceeding, and with respect to any claim of any kind whatsoever relating thereto, including but not limited to any counter claim, action sounding in tort, fraud, or otherwise, arising or related in any way to your relationship with the Bank.

34. Choice of Law and Forum. In the sole event that the Agreement to arbitrate contained in this Agreement is or becomes unenforceable, you hereby agree and irrevocably consent that your Account and relationship with the Bank shall be governed and construed exclusively by the laws and subject to the exclusive jurisdiction of Nevis, without regard to any conflict of law provision or consideration that may otherwise be applicable. For the avoidance of doubt, the arbitration clause of this Agreement shall govern all claims and disputes arising in connection with your Account and relationship with the Bank unless it is determined to be unenforceable as a matter of law.

35. Assignment and Successors. This Agreement shall be binding on your personal representative, executors, administrators. You may not assign, transfer, grant any security interest in or otherwise hypothecate, this Agreement without the Bank's prior written consent. Even with the Bank's prior written consent, no assignment of this Agreement will be valid or binding on the Bank, unless the Bank at its discretion records such approval of the assignment in our records and provides you with certified notice of that record.

36. Referrals. Upon request, our employees may provide contact information for third parties, including lawyers, accountants, or contractors who offer products and services not offered by the Bank. Some of these third parties may be Bank customers. While such referrals or information are provided solely as a courtesy to you and the third party, we or our affiliates may be compensated for referrals that we provide. The Bank makes no representations, and expressly disclaims all warranties, regarding the services or products of any third parties that we refer. If you decide to do business with a party referred to by the Bank, that decision is yoursalone and the Bank is not responsible for the third-party's performance, conduct, or to assist inthe resolution of any disputes between you and the third-party.

37. Execution and Modification by Conduct. You agree that the submission to the Bank of any Account Application by you or any agent acting on your behalf, the initial or continued use of any Account provided by the Bank, or use of the banking, investment, or other financial or non-financial services generally providedby the Bank to You, shall constitute conclusive proof that you, as well as any owner or party having control of your Account, agree to the terms and conditions of this Agreement which terms cover the entirety of your past, present, and future relationship with the bank and supersede any applicable terms and conditions. Furthermore, you agree to be legally bound and obligated by any action taken by one or more authorized signatories to your Account. As such, Account Holder(s) and Authorized Signer(s) named in the Account Application hereby certify and attest that I/we am/are the natural person(s) who is/are applying to open this Account with Hamilton Reserve Bank Ltd. ("HRB"), and that I/we hereby represent and attest that: (i) I/we will not use the services of HRB for any unlawful activity or purpose; (ii) I/we have read, understand, and agree to this Hamilton Reserve Bank

Ltd. Customer Account Agreement; (iii) all information that I/we have provided to HRB is true, accurate and complete; (iv) I/we will notify HRB immediately of any material changes to the information contained in this application, and; (v) I/we authorize HRB to be an information processor and make initial and ongoing credit and other inquiries with third-parties in connection with my/our Account for purposes of compliance with applicable law and the provision of financial services. (End of Agreement. Customer consent page follows.)

HAMILTON RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** LSPG Long-Term Strategies, LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of LSPG Long-Term Strategies, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Diana Claxton-Whittaker

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of LSPG Long-Term Strategies LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Marc Brühwiler

Title: Vice President, Banking

*Signature*

Date: 14 June 2024

HAMILTON RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** LSPG Long-Term Strategies, LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of LSPG Long-Term Strategies, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Diana Claxton-Whittaker

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of LSPG Long-Term Strategies LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Marc Brühwiler

Title: Vice President, Banking

*Signature*

Date: 14 June 2024

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

**CORPORATE OWNERSHIP STATEMENT**
**OF LSPG LONG-TERM STRATEGIES, LLC**

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rules 1010-1 and 7007.1-1 of the Local Bankruptcy Rules for the Southern District of New York, petitioner LSPG Long-Term Strategies, LLC (the "Petitioner"), states that it is a limited liability company organized under the laws of Nevis. Mala Rokada, LP, a Delaware limited partnership, owns 56.68% of the Petitioner's equity interests. Jojo (Nevis) Limited Liability Company, a Nevis limited liability company, owns 43.32% of the Petitioner's equity interests.

**Declaration Under Penalty of Perjury**

I, the undersigned authorized representative of Lighthouse Management Services, LLC, as manager of the Petitioner, declare under penalty of perjury that I have reviewed the "Corporate

Ownership Statement" and that it is true and correct to the best of my knowledge, information and belief, with reliance on appropriate corporate officers.

Dated: November 13, 2026

By: /s/ *Harald Linhart*
Harald Linhart
*General Manager of Lighthouse Management Services, LLC as manager of LSPG Long-Term Strategies, LLC*

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

**DECLARATION OF LIGHTHOUSE MANAGEMENT SERVICES, LLC, AS MANAGER OF VELIKA LLC, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003(A)**

Pursuant to 28 U.S.C. § 1746, Harald Linhart declares as follows:

1. I make this declaration (the "Declaration") on behalf of Lighthouse Management Services, LLC ("Lighthouse"), as manager of Velika LLC (the "Petitioning Creditor"), in the above-captioned involuntary chapter 11 case (the "Bankruptcy Case") filed by the Petitioning Creditor and other petitioning creditors against Hamilton Reserve Bank Ltd. (the "Debtor"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to the Petitioning Creditor's claims against the Debtor. If called to testify in connection with the Bankruptcy Case, the following would constitute my testimony.

2. I am the General Manager of Lighthouse, the manager of the Petitioning Creditor.

3. The Petitioning Creditor holds claims against the Debtor based on the Debtor's refusal to honor withdrawal requests from a CHF deposit account maintained with the Debtor (the "Deposit Account"). As of the date of this Declaration, the Deposit Account reflected a balance of $115,324.62,[1] per the Debtor's online banking system.

4. The Petitioning Creditor's claims arise from the Debtor's failure to honor the Petitioning Creditor's instructions to withdraw and transfer funds held by the Debtor in the Deposit Account. In late November of 2025, the Petitioning Creditor requested the Debtor make a transfer out of the Deposit Account, and the Debtor failed to process the transfer as requested. On June 16, 2026, the Petitioning Creditor directed the transfer of all CHF funds held by the Debtor in the Deposit Account, which the Debtor never executed.

5. The Petitioning Creditor's claims arising from the Deposit Account, including any accrued but unpaid interest thereon, plus applicable fees, costs, and other charges, are being relied upon for the purpose of satisfying the requirements of 11 U.S.C. § 303(b)(1) and were acquired on June 28, 2024, pursuant to that certain Customer Account Agreement attached hereto.

6. The Petitioning Creditor may also hold other claims against the Debtor based upon other accounts, deposits, securities, or debt instruments of the Debtor.

7. The Petitioning Creditor made deposits into the Deposit Account in the ordinary course of its banking relationship with the Debtor and not for the purpose of commencing the Bankruptcy Case.

[1] The USD amounts herein reflect conversion rates as of the Petition Date for accounts in CHF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of November, 2026.

By: /s/ *Harold Linhart*
Harold Linhart
*General Manager of Lighthouse Management Services, LLC, as manager of Velika LLC*

HAMILTON RESERVE BANK

# Account Statement

| | |
|---|---|
| ACCOUNT HOLDER<br>**VELIKA LLC** | ADDRESS<br>LIGHTHOUSE TRUST LIMITED, 3 1/2 MILES PHILLIP GOLDSON HIGHWAY, BELIZE CITY, Belize |
| PERIOD<br>14/May/2026 — 13/Nov/2026 | GENERATED ON<br>13/Nov/2026, 07:38 PM |

## VELIKA LLC · 0010000022981

| | |
|---|---|
| ACCOUNT NAME<br>**VELIKA LLC** | ACCOUNT NUMBER<br>[redacted]**2981** |
| ACCOUNT TYPE<br>Corporate Savings Account | CURRENCY<br>CHF |

| DATE | DESCRIPTION | BENEFICIARY | TRANSACTION ID | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|---|
| 30/Sep/2026 | **Professional-Legal Service Fee** | | CHG2627311190 | -25,000.00 | | 198,035.99 |
| 29/Sep/2026 | **Certified Bank Statement Fee** | | CHG2627222152 | -1,800.00 | | 223,035.99 |

AVAILABLE BALANCE AS OF 13/NOV/2026 CHF **96,735.99**

**HAMILTON RESERVE BANK**

*"The Hometown Bank of Alexander Hamilton"*

Hamilton Reserve Bank Plaza, Jessups Estate, Nevis, Saint Kitts and Nevis

Telephone: +1 (869) 469-8889 | www.hrbank.com | SWIFT: NIBTKNNE

**COMMERCIAL BANKING | CUSTODIAN BANKING | ASSET MANAGEMENT | INVESTMENT BANKING**

**HAMILTON RESERVE BANK LTD.**
**CUSTOMER ACCOUNT AGREEMENT**
**Effective: September 6, 2021**

The words "you," "your," "account holder," and "Customer" mean the person or legal entity that has submitted an account application (hereinafter an "Account Application") to or opened an Account with the Bank, as well as all signatories on any Bank documentation.

The words "Bank," "we," "our," and "us" mean *Hamilton Reserve Bank Ltd.*, a bank chartered under the laws and governance of the Island of Nevis of the Federation of St. Kitts & Nevis, as well as any Bank affiliates or partners.

This is your customer agreement with the Bank (the "Agreement"). The Bank will provide you with additional agreements and documentation throughout our relationship with you which are part of this Agreement. As such, this Agreement includes:

(a) the terms and conditions governing all activity in relation to the existence and operation of your deposit accounts with the Bank.

(b) those certain additional terms and conditions that the Bank provides to you in writing prior to approving your account to utilize a particular banking service or facility including any account opening forms.

(c) all interests and Fees charged by the Bank, the benefits we supply to you, ourselves, and the terms and conditions of this Agreement, as well as any additional documentation we may provide to you from time to time.

To the extent that the Bank provides you with more specific terms and conditions regarding your Account and relationship with the Bank, those terms and conditions shall supersede those described below. Your use of a credit card offered through the Bank is not controlled by this Agreement and is instead governed by a separate agreement that is provided upon an application for a Bank issued credit card.

## DEFINITIONS

The following are definitions of some of the key terms used in this Agreement:

a. "**Account**" means any account that accepts deposits regardless of currency or asset type thatis covered by this Agreement.

b. "**Account Holder**" means the individual or business entity owning the Account**.**

c. "**Authorised Signatory**" means any signatory to an Account Application.

d. "**Available Balance**" means the balance in your Account excluding any pending credit or

debit transactions or amounts that are not available for withdrawal pursuant to the Bank Funds Availability Policy (defined below), that we are otherwise legally obligated to pay.

e. "**Business Day**" means every day except Saturdays, Sundays, and certain Bank Holidays. Depending on the particular Bank service provided, certain business operations may be unavailable from time to time due to local bank holidays in the United States, the United Kingdom, and India.

f. "**Business Hours**" means the hours between 8:00AM and 4:00PM (Eastern Standard Time) on any Business Day.

g. "**Funds Availability Policy**" means a policy kept at the discretion of the Bank and includes a variety of factors relating to the availability of funds in an Account. While the availability of funds shall always remain subject to the Bank's unencumbered and sole discretion, it is informed by those various legal and financial risks particular to your Account. For further detail on how this policy may affect your Account, please inquire directly with Bank management.

h. "**Item**" means any ACH, wire, funds transfer, ATM withdrawal, debit or credit card purchase, Fee, charge, or other amount that is added to, or subtracted from, the balance of assets in your Account.

**ACCOUNTS & SERVICES**

1. Account Opening Forms. Every person or entity opening an Account must complete a new Account Application in order to establish a basic deposit account as well as any other documentation required by the Bank in connection with additional services you use that are provided by the Bank.

2. Who Can Open Accounts with the Bank. Accounts may be opened by individuals and legal entities around the world, subject to compliance review and approval. You agree that the Bank may decline to open an Account for any reason.

3. Business Accounts. If you have opened your Account as a "Business Account" using the Business Account Application or any other documentation we have provided to you, you agree not to use the Account for personal purposes. Unless otherwise described in Bank Documentation, a "Business" or "Business Organization" shall be a corporate, limited liability company, limited company, or other legal entity formed under the laws of the jurisdiction of its formation, any governmental organization, or validly created trust. We may rely on the accuracy and authority of any and all Business resolutions, signatures, certificates of incorporation, by-laws, operating agreements, trusts, authorisations, resolutions, or other documentation provided to us, or that we request in connection with any Business Account.

4. Additional Documentation. You must also complete or provide any other documentation we may require from time to time. We will conduct due diligence in our discretion on each Account Holder and Authorised Signatory prior to the time an Account is opened. We may rely upon the documentation we have in our files regarding the identity of the Authorised

Signatories on your Account until you present appropriate documentation identifying other Authorised Signatories. If we do not obtain the information we need under our customer identification program, we reserve the right to prevent you from accessing the funds in your Account until we obtain that information, and you agree we will not be liable to you if any payment order is not paid during this time. Subject to our anti money laundering and counter terrorist financing program requirements, we will tell you in writing if we take this action.

5. Powers of Authorised Signatory to modify Account Information. No Authorised Signatory may remove or add the name of another Authorised Signatory unless the resolutions designating the Authorised Signatories specifically permit that Authorised Signatory to do so.

6. Making Deposits. You may make an electronic deposit into your Account in person at any of our branch offices, through another financial institution, or by any other physical or electronic method we make available. The Bank does not currently issue or accept cheques or accept cash deposits. We may refuse a deposit, limit the amount of a deposit, or return all or a portion of a deposit. When the Bank receives an electronic deposit to your account, the only affirmative notice you will receive from us is on your next statement. You may login to any online banking account provided by the Bank to check your balance and deposits at any time so long as that Account has been set up by you and the Bank. You may also call the Bank during regular Business Hours to confirm that we have received a deposit. Any telephone communication with Bank personnel will be subject to reasonable security procedures which you agree may be implemented subject to the sole discretion of the Bank. If the bank or other party that sent an electronic deposit to your Account advises the Bank that the transfer was made in error, or was intended for another customer or account, the Bank may immediately deduct the transferred amount from your balance without conducting an investigation into the claim of error.

7. Right to Refuse Deposits. We are not responsible for any deposit you send to us that we do not receive. All deposits to your Accounts, regardless of how made, are subject to verification, final payment, and our Funds Availability Policy. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. The Bank does not accept cash deposits and shall have no obligation whatsoever to hold, maintain, or return any cash deposit received by mail or in person.

8. Correspondent and Financial Agents. In order to provide you with the best service, the Bank may use the services of certain correspondent banks, financial entities and institutions, banking software providers, as well as digital services companies and common carriers ("Banking Agents"), as well certain funds transfer methods and account systems provided as part of the services provided by such Banking Agents in order to provide services to you under this Agreement. You agree that any Banking Agent shall be your agent with actual authority to act on your behalf in providing any banking services. As such, the Bank shall not be liable to you by reason of: (i) any act or omission by a Banking Agent that is beyond the reasonable control of the Bank, or; (ii) the loss, diminution, or destruction of any funds, security, certificate, document, or asset of any kind while in transit or custody of any Banking Agent, or while under the possession, custody, or control of a person or entity other than the Bank.

9. Calculating Interest in Your Account. The Bank may or may not pay interest on your account at the Bank's sole discretion. If interest is paid, you must be notified by the Bank in writing. The interest rate of interest accruing in your account (the annualpercentage yield or ("APY") on all interest-bearing checking, savings, brokerage, money market savings, or other Accounts may change at any time after the Account is opened. The interest rate and APY may be changed by the Bank as often as we choose, without limits and without notice. The Bank calculates interest on Accounts utilizing the daily balance method, applying a daily periodic rate to the available principal balance in your Account each day. Asa general matter, interest in your Account is calculated based on the assumption of a 365-day year. Deposits in Your Account will begin to accrue interest on the Business Day that the fundsare included under your Available Balance. Earned interest shall be paid to you by crediting the amount of the accrued interest to your Account. If you close your Account before interest is credited, we shall not be obligated to pay you that interest.

10. Withdrawals. Notwithstanding a more specific agreement with the Bank in relation to a particular Bank service or facility, Assets from your Account generally may be withdrawn three business days after they have cleared in your Account. The availability of funds in your Account to withdraw does not mean the deposit made in your Account is "good," has "cleared" or has been paid by the paying financial institution. As a general matter, and except as otherwise provided in the Agreement, you may make withdrawals from your Account up to the amount of the Available Balance using any means or method that the Bank makes available to you. We may require two forms of identification for any withdrawals or transfers out of your Account to be presented at any branch office of the Bank. We may also contact you electronically through electronic means or directly by phone to confirm your identity and verify your authorization to conduct the withdrawal. While we reserve the right to refuse a withdrawal request exceeding the available funds in your Account (even in the case of deposit made by you later in the Business Day after a withdrawal request is refused) the Bank will endeavor to make your assets available to you as promptly as possible within its discretion and the parameters of its Funds Availability Policy. For information about when funds from a deposit become available and you can withdraw them, please see the Definitions Section of the Agreement, or inquire directly with Bank management regarding the Bank Funds Availability Policy.

11. Refusal of Withdrawals. Before allowing funds to be withdrawn from your Account, we may request that you provide us with certain confirmations, identification, authorisations, documentation, or other information that the Bank determines to be necessary in its sole and absolute discretion. You acknowledge that your refusal to comply with any such request may result in the Bank's refusal to allow the withdrawal. The Bank is not required to notify you in advance if it will seek additional information prior to allowing a withdrawal from your Account.

12. Multiple Signature Requirements. If you elect to require multiple signatures in order to conduct business in your Account, this requirement will be strictly enforced by the Bank.

13. Minimum Account Balance. The Bank may require a minimum Account opening balance or equivalent value in addition to related Fees per Personal or Business Account. Should your Account opening balance fall below these minimum balances, you will receive a notice of the

deficiency. The Bank has the right in its sole discretion to close Accountsor reject Account applications for Accounts that fall below, or would not meet, the minimum required Account opening balances. The Bank may charge Fees against your Account so longas they remain under the minimum required opening balance.

14. Insufficient Balance on Withdrawal. If your available balance is not enough to pay a transaction you make and we pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Paid Fee. If we do not pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Returned Fee. In either case, additional Fees may also be charged to your Account.

15. Fees. You agree to pay any fees, charges, or other costs (collectively referred to herein as "Fees") applied to your Account from the balance of your Account, even if that balance may be negative. The Bank may apply Fees to your Account for those amounts, purposes, and with any frequency, it deemsappropriate in its sole discretion. Moreover, the Bank may apply different Fees by reason of, among other things, the amount of funds or assets held in a given Account or Accounts, the services provided to an Account Holder, as well as the Account Holder's relationship with theBank. Such Fees may be applied and changed without prior notice to you and will be reflected inyour monthly statements. For more information on specific Fees and charges applied by theBank to your Account, please contact your Bank relationship manager or, as available, submita question through the Bank's secure customer portal online. While the Bank shall not be required to provide you with any particular Fee schedule, any schedule of Fees provided to youin writing shall be deemed a part of this Agreement.

16. Online Account Availability**:** Subject to the availability of any of the Bank's information technology providers and telecommunications carriers, or as necessary for the Bank to conduct maintenance or upgrades to the software or the Bank's online services, Access to any online banking services made available by the Bank will be generally available 24 hours a day and 7 days a week. As the Bank relies on various software and telecommunications systems, the Bank shall only be responsible for that information which its staff receives and shall not be liable to Account Holder for any disruptions, unavailability, or errors arising from of one or more aspects of any software if such software was implemented or is serviced by third parties.

17. Account Statements and Account Notices. All Account statements and notices will be made available to you exclusively and electronically through the Bank's online banking services and/or secure login messaging center. The Bank does not mail physical account statements or offer mail holding services. You agree that it is your responsibility to sign up for, and regularly monitor, your online account. The Bank shall not be liable for any losses that arise in your Account as the result of your failure to monitor your account or respond to Bank notice regarding your Account. Statements of your Account shall be made available online on a monthly basis and will reflect activity in your Account occurring subsequent to your last statement. Your statement shall be deemed delivered to you at the time it becomes available to you through the Bank's online banking systems. One signatory to the Account will be provided access to the online banking systems and is solely responsible for conveying all statements and notices to the Account Holder.

18. Your Obligation to Review Account Statements. You have an affirmative obligation to review all Account statements and notices online and to immediately notify the Bank of any errors in those statements or notices. Your obligation to review your Account information generally also includes:

    (a) Examining all activity in your Account and statements on a prompt and regularbasis.

    (b) Notifying the Bank within three (3) days of receipt of the information of all errors in any statement, notice, or on your Account, including the identification of any pieceof information you believe may have been altered.

19. Foreign Currency Transactions. Any transactions we conduct involving a foreign currency on your behalf will use a Bank determined foreign exchange rate which will include a spread and may include certain other Fees, such as commissions or other costs that we, our vendors, affiliates, or counterparties may charge in providing or facilitating foreign exchange transactions. The particular rates applied may depend on a variety of factors, including your relationship with the Bank, the type or frequency of transactions, the value of the transactions on an individual or aggregate basis, the type of currency, the date and time of the exchange, and whether the transaction results in a debit or credit to your Account. As the result of the costs to the Bank and the value of the services, these rates may be less favorable than those quoted on the internet.

20. Death or Incompetence of Account Owner or Affecting Signatory Authority. You must notify the Bank immediately upon the death, dissolution, or incompetence of any Account Holder or Authorised Signatory to your Account. After we receive any such notice, whether from you or from other sources, we may freeze the balance of the Account, refuse any transactions, as well as return or otherwise reverse deposits. The Bank may further refuse to release any assets until reasonable documentation is provided verifying or disproving the Account Holder or any Authorised Signatory's death or incompetence, as well as, in the case of such death, dissolution, or incompetence, who is entitled to the assets of the Account. If you die or the entity Account Holder is dissolved while residing outside of Nevis, we may require a personal representative be appointed in a court of competent jurisdiction to manage the Account Holder's interests prior to releasing any assets. Any tax liability arising against the Bank as the result of the death, dissolution, or incompetence of the Account Holder shall be deducted from any transfer out of the Account.

    If you owe any debt to the Bank at the time of your death or dissolution, the Bank shall have the full and absolute right to exercise its right of set off (which is the Bank's right to apply funds in one Account to the debt associated with another Account with the same Account Holder) or security interest rights against any funds credited to your balance after your death or dissolution. These rights shall withstand the rights of any beneficiary of any trust that may have rights to the Account or the property and rights of the Account Holder.

21. Power of Attorney. A power of attorney is a document that you sign authorizing someone else to act on your behalf. In this relationship the person acting on your behalf is your agent. Once

signed, the agent can sign on your behalf and do everything that you could do for your Account, including withdrawing or otherwise spending all of the money in the Account. You should not sign a power of Attorney that grants control over your Account (whether generally or specifically) unless you trust the agent you are appointing to act in your best interests. If you choose to appoint an agent by power of attorney, it must be through a power of attorney form that we agree to accept. We may rely on an original power of attorney and may follow or refuse to follow an agent's requests at any time for any reason, for example if we suspect fraud or abuse of your Account. The Bank shall have no liability arising from its decision to follow or refuse instructions from an agent.

22. Closing Your Account. You or the Bank may close your Account at any time for any reason or no reason and without prior notice to you or the Bank. The Bank is however not required to close any Account under the following circumstances: (a) if you have pending or otherwise unresolved transactions; (b) it is not possible to close, liquidate, or otherwise pay-out the assets held in your Account; (c) where the Account is overdrawn, and; (d) where the Account is subject to legal process initiated in the Island of Nevis. After your Account is closed, we have no obligation to accept deposits, or to otherwise engage in any business with you whatsoever.

23. Use of Information. As a Customer, the Bank appreciates the importance of confidentiality while ensuring compliance with applicable law. As such, the Bank will collect personal information from you only on a as needed basis. All information collected by the Bank is subject to strict confidentiality protections and procedures, including procedural, physical, and electronic safeguards to secure your information from unauthorised use and accidental or unlawful alteration and destruction. We hold our employees accountable for complying with the strictest confidentiality procedures. We will retain copies of information in paper or electronic form at our discretion, and as a general matter, only so long as is necessary to comply with applicable law or as necessary to exercise any legal rights with respect to your relationship with the Bank. You hereby authorise the Bank to use and share your information solely as may be necessary to provide services requested by You, conduct due diligence or otherwise maintain a high standard for the Bank's internal legal, operating, and compliance processes (for example as part of the Bank's ongoing Anti Money Laundering procedures), or as otherwise necessary to comply with the laws of the Island of Nevis or any other jurisdiction in which you or the Bank conducts its business.

24. Disputes Involving Account Control. Should any dispute arise from the provision of conflicting instructions to the Bank from one or more Authorised Signatories, we may freeze the funds until there is a clear resolution from all Authorised Signatories and the Account Holder or from a court of jurisdiction deemed competent by the Bank.

25. Certification of Legal Use of Account. You hereby certify, agree and attest that you shall not use this Account or any other account or relationship with the bank to engage in any illegal conduct or activity, including but not limited to fraud, money laundering, terrorist financing, proliferation of weapons of mass destruction, human or drug trafficking.

26. Restricting the Account. In order to protect you or the Bank, some or all of the services in your Account and any transaction, whether in pending or requested, in your Account may be refused,

frozen, reversed, or delayed for any reason in the Bank's sole discretion.

27. Liability, Indemnification and Customer Instructions. We will not be liable for anything we do when following your instructions or the instructions of your agents. Furthermore, the Bank shall not be liable should it fail to follow your instructions or your agents' instructions so long as the Bank believes that such instructions may expose the Bank to potential losses, civil or criminal liability, or otherwise conflict with any customary banking practice. The Bank will not be liable for indirect, special, or consequential damages regardless of the form of action and even if the Bank has been advised of the possibility of such damages. If the Bank is found at fault by the Nevis court for failing to prevent fraudulent access to your Account by means of any forged Account Holder signature or representation, the Bank's liability, if any, shall be limited to the face amount of the Item. To the extent that there is a discrepancy between your instruction and the Bank's interpretation of that instruction, the Bank's interpretation shall control. You hereby authorize the Bank to accept Account instructions by electronic means and hereby agree to indemnify, defend, and hold the Bank harmless from any losses orclaims arising in connection with your decision to communicate with the Bank through any means, electronic or otherwise.

28. Wealth Management Services. Account Holder has appointed the Bank as its agent and attorney-in-fact to buy and sell securities or other investment products, as well as provide advice, guidance and investment related services for the Account at Account Holder's risk. Account Holder hereby agrees to indemnify and hold the Bank, and its officers, directors, agents, employees and affiliates harmless from all loss, cost, indebtedness and liabilities arising there from. In all such purchases and sales, the Bank is authorized to follow the instructions of the Account Holder in every respect concerning the Account and, except as herein otherwise provided, the Bank is authorized to act for Account Holder in the same manner and with the same force and effect as Account Holder might or could do with respect to such purchases and sales as well as with respect to all other things necessary or incidental thereto, except that the Bank is not authorized to withdraw any money, securities or other property either in the name of Account Holder or otherwise. This authorization is a continuing one and shall remain in full force and effect until terminated in writing. Termination of this authorization shall constitute a material breach of this Agreement by the Account Holder. In no event will the Bank be obligated to affect any transaction for Account Holder which it believes would be violative of any applicable law, rule or regulation, or of the rules or regulations of any regulatory or self-regulatory body. In the event the Account Holder instructs the Bank to purchase, sell, or otherwise modify any investment or financial products for Account Holder's own investment account, Account Holder authorizes the Bank to deduct any and all fees when due from the assets contained in that investment account, including fees charged by any financial advisor to the Bank, and pay them to the such advisor(s) on behalf of Account Holder. The Bank will pay the amount shown to be due on the invoice and will not verify the rate, computation, or timing of the Advisor's fee or the value of the assets used in this connection. Account Holder understands that the Bank and its affiliates may perform, among other things, investment banking, research, brokerage, and investment advisory services for other account holders or clients. Account Holder recognizes that the Bank may give advice and take action in the performance of its duties to other account holders or other clients which may differ from advice given, or in the timing and nature of action taken, with respect to Account Holder. Moreover,

the Bank or any of its affiliates may advise or take action with respect to itself or themselves differently than with respect to Account Holder. Nothing in this Agreement shall be deemed to impose on the Bank any obligation to recommend any investment for purchase or sale, for Account Holder any investment which the Bank may recommend for purchase or sale, for its own account, or for the account of any other account holder or client, nor shall anything on this Agreement be deemed to impose upon the Bank any obligation to give Account Holder the same advice, pricing, or terms of any particular investment as may be given to any other account holders, other clients, itself or third parties. All wealth management and advisory services are offered and sold exclusively by the Bank itself on a direct and private basis to existing customers, and not on behalf of any other financial services providers.

29. No Waiver. The failure by the Bank to enforce any of the rights or terms in pursuant to this Agreement shall not be deemed a waiver of any of those rights or terms. The Bank may still enforce all of its rights under this Agreement, even if it fails to exercise any or all of those rights.

30. Changes to the Agreement. This Agreement, any Fees, or features of your Account, may be updated from time to time at the Bank's discretion and without prior notice to you. The Bank may direct you to its website at www.hrbank.com for the content of any revised Agreement or may publish any revised Agreement through any of the electronic or online services provided by the Bank. By maintaining your Account after the publication of any changes to the Agreement, you agree to those changes.

31. Conflicts. If this Agreement conflicts with any statement or writing made by one of the Bank's employees, this Agreement will govern. To the extent that additional terms and conditions are provided to you for specific services under this Agreement in writing, the additional terms shall control to the extent that they do not conflict with this Bank Customer Agreement. To the extent that any terms of this Agreement may be determined by a court of competent jurisdiction in Nevis to be unenforceable, the unenforceability of such terms shall not affect the validity or effect of the remainder of this Agreement.

32. Merger. The terms of this Agreement along with any account forms or other formal written documentation provided to you by the Bank form one and the same Agreement unlessotherwise stated on, or as a part of, such other documentation, and supersede all prior written or oral agreements between you and the Bank. In the event of any dispute arising from any subsequent or contemporaneous communications, forms, or agreements between you and the Bank, regardless of the language of those communications, forms or agreements, this Agreement shall control.

33. Agreement to Arbitrate. In the event of a dispute arising out of or relating to this contract, including any question regarding its existence, validity or termination, the parties shall first seek settlement of that dispute by mediation with a mediator selected by the Bank. If the dispute is not settled by mediation within 120 days of the appointment of the mediator, or such further period as the parties shall agree in writing, the dispute shall be referred to and finally resolved by arbitration by an arbitrator selected by the parties and subject to the law and rules of procedure of the courts of Nevis, which rules are deemed to be incorporated by reference into

this clause. The language to be used in the mediation and in the arbitration shall be English. The number of arbitrators shall be three and the seat, or legal place, of arbitration shall be Charlestown, Nevis. You irrevocably waive, to the fullest extent permitted by law, all right to a public trial in any action, proceeding, and with respect to any claim of any kind whatsoever relating thereto, including but not limited to any counter claim, action sounding in tort, fraud, or otherwise, arising or related in any way to your relationship with the Bank.

34. Choice of Law and Forum. In the sole event that the Agreement to arbitrate contained in this Agreement is or becomes unenforceable, you hereby agree and irrevocably consent that your Account and relationship with the Bank shall be governed and construed exclusively by the laws and subject to the exclusive jurisdiction of Nevis, without regard to any conflict of law provision or consideration that may otherwise be applicable. For the avoidance of doubt, the arbitration clause of this Agreement shall govern all claims and disputes arising in connection with your Account and relationship with the Bank unless it is determined to be unenforceable as a matter of law.

35. Assignment and Successors. This Agreement shall be binding on your personal representative, executors, administrators. You may not assign, transfer, grant any security interest in or otherwise hypothecate, this Agreement without the Bank's prior written consent. Even with the Bank's prior written consent, no assignment of this Agreement will be valid or binding on the Bank, unless the Bank at its discretion records such approval of the assignment in our records and provides you with certified notice of that record.

36. Referrals. Upon request, our employees may provide contact information for third parties, including lawyers, accountants, or contractors who offer products and services not offered by the Bank. Some of these third parties may be Bank customers. While such referrals or information are provided solely as a courtesy to you and the third party, we or our affiliates may be compensated for referrals that we provide. The Bank makes no representations, and expressly disclaims all warranties, regarding the services or products of any third parties that we refer. If you decide to do business with a party referred to by the Bank, that decision is yoursalone and the Bank is not responsible for the third-party's performance, conduct, or to assist inthe resolution of any disputes between you and the third-party.

37. Execution and Modification by Conduct. You agree that the submission to the Bank of any Account Application by you or any agent acting on your behalf, the initial or continued use of any Account provided by the Bank, or use of the banking, investment, or other financial or non-financial services generally providedby the Bank to You, shall constitute conclusive proof that you, as well as any owner or party having control of your Account, agree to the terms and conditions of this Agreement which terms cover the entirety of your past, present, and future relationship with the bank and supersede any applicable terms and conditions. Furthermore, you agree to be legally bound and obligated by any action taken by one or more authorized signatories to your Account. As such, Account Holder(s) and Authorized Signer(s) named in the Account Application hereby certify and attest that I/we am/are the natural person(s) who is/are applying to open this Account with Hamilton Reserve Bank Ltd. ("HRB"), and that I/we hereby represent and attest that: (i) I/we will not use the services of HRB for any unlawful activity or purpose; (ii) I/we have read, understand, and agree to this Hamilton Reserve Bank

Ltd. Customer Account Agreement; (iii) all information that I/we have provided to HRB is true, accurate and complete; (iv) I/we will notify HRB immediately of any material changes to the information contained in this application, and; (v) I/we authorize HRB to be an information processor and make initial and ongoing credit and other inquiries with third-parties in connection with my/our Account for purposes of compliance with applicable law and the provision of financial services. (End of Agreement. Customer consent page follows.)

HAMILTON RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** Velika LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Lighthouse Manageme

*Signature*

Date: 28 June 2024

Additional Authorized Signer ("You"):

Name: Diana Claxton-Whittaker

Title: Manager of Lighthouse Manageme

*Signature*

Date: 28 June 2024

Additional Authorized Signer ("You"):

Name: Marc Brühwiler

Title: Director of Lighthouse Swiss Trust

*Signature*

Date: 28 June 2024

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

## CORPORATE OWNERSHIP STATEMENT OF VELIKA LLC

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rules 1010-1 and 7007.1-1 of the Local Bankruptcy Rules for the Southern District of New York, petitioner Velika LLC (the "Petitioner"), states that it is a limited liability company organized under the laws of Belize. Velika Rokada Trust, a Belize international trust settled September 3, 2012, holds 100% of the Petitioner's equity interests.

**Declaration Under Penalty of Perjury**

I, the undersigned authorized representative of Lighthouse Management Services, LLC, as manager of the Petitioner, declare under penalty of perjury that I have reviewed the "Corporate Ownership Statement" and that it is true and correct to the best of my knowledge, information and belief, with reliance on appropriate corporate officers.

Dated: November 13, 2026

By: /s/ *Harold Linhart*
Harold Linhart
*General Manager of Lighthouse Management Services, LLC, as manager of Velika LLC*

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

**DECLARATION OF LIGHTHOUSE INTERNATIONAL SERVICES, LLC, AS MANAGER OF RJJ INTERNATIONAL HOLDINGS, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003(A)**

Pursuant to 28 U.S.C. § 1746, Harald Linhart declares as follows:

1. I make this declaration (the "Declaration") on behalf of Lighthouse International Services, LLC ("LIS"), as manager of RJJ International Holdings, LLC (the "Petitioning Creditor"), in the above-captioned involuntary chapter 11 case (the "Bankruptcy Case") filed by the Petitioning Creditor and other petitioning creditors against Hamilton Reserve Bank Ltd. (the "Debtor"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to the Petitioning Creditor's claims against the Debtor. If called to testify in connection with the Bankruptcy Case, the following would constitute my testimony.

2. I am the Manager of LIS, the manager of the Petitioning Creditor.

3. The Petitioning Creditor holds claims against the Debtor based on the Debtor's refusal to honor withdrawal requests from USD and EUR deposit accounts maintained with the Debtor (the "Deposit Accounts"). As of the date of this Declaration, the Deposit Accounts reflected a balance of $7,578.42,[1] per the Debtor's online banking system.

4. The Petitioning Creditor's claims arise from the Debtor's failure to honor the Petitioning Creditor's instruction to withdraw and transfer funds held by the Debtor in the Deposit Account. On September 24, 2026, the Petitioning Creditor requested a transfer of EUR 2,500 from the Deposit Account. The transfer request was refused by the Debtor's online banking system and has not been executed as of the date of this Declaration.

5. The Petitioning Creditor's claims arising from the Deposit Accounts, including any accrued but unpaid interest thereon, plus applicable fees, costs, and other charges, are being relied upon for the purpose of satisfying the requirements of 11 U.S.C. § 303(b)(1) and were acquired on June 14, 2024, pursuant to that certain Customer Account Agreement attached hereto.

6. The Petitioning Creditor may also hold other claims against the Debtor based upon other accounts, deposits, securities, or debt instruments of the Debtor.

7. The Petitioning Creditor made deposits into the Deposit Accounts in the ordinary course of its banking relationship with the Debtor and not for the purpose of commencing the Bankruptcy Case.

[1] The USD amounts herein reflect conversion rates as of the Petition Date for accounts in EUR.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of November, 2026.

By: /s/ *Harald Linhart*
Harald Linhart
*General Manager of Lighthouse International Services, LLC, as manager of RJJ International Holdings, LLC*

HAMILTON RESERVE BANK

# Account Statement

| | |
|---|---|
| ACCOUNT HOLDER<br>**RJJ INTERNATIONAL HOLDINGS, LLC** | ADDRESS<br>3 1/2, MILES PHILLIP GOLDSON HIGHWAY, BELIZE CITY, Belize |
| PERIOD<br>14/May/2026 — 13/Nov/2026 | GENERATED ON<br>13/Nov/2026, 07:38 PM |

## RJJ INTERNATIONAL HOLDINGS, LLC · 0010000020930

| | |
|---|---|
| ACCOUNT NAME<br>**RJJ INTERNATIONAL HOLDINGS, LLC** | ACCOUNT NUMBER<br>[redacted]**0930** |
| ACCOUNT TYPE<br>Corporate Savings Account | CURRENCY<br>USD |

| DATE | DESCRIPTION | BENEFICIARY | TRANSACTION ID | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|---|
| 19/Jun/2026 | **Certified Bank Statement Fee** | | CHG2617024441 | -600.00 | | 3,815.47 |

AVAILABLE BALANCE AS OF 13/NOV/2026 USD **3,815.47**

HAMILTON RESERVE BANK

# Account Statement

## RJJ INTERNATIONAL HOLDINGS, LLC · 0010000020932

| | |
|---|---|
| ACCOUNT NAME<br>**RJJ INTERNATIONAL HOLDINGS, LLC** | ACCOUNT NUMBER<br>[redacted]**0932** |
| ACCOUNT TYPE<br>Corporate Savings Account | CURRENCY<br>EUR |

| DATE | DESCRIPTION | BENEFICIARY | TRANSACTION ID | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|---|
| 29/Sep/2026 | **Certified Bank Statement Fee** | | CHG2627291107 | -1,800.00 | | 3,413.88 |
| 19/Jun/2026 | **Certified Bank Statement Fee** | | CHG2617085043 | -600.00 | | 5,213.88 |
| 12/Jun/2026 | **Outgoing wire fee** | | AAACT26163JT64YZNP | -350.00 | | 5,813.88 |
| 12/Jun/2026 | **Expense Reimbursement** | Lighthouse Management HK Limited · 390204737 | PI261630BWZXDVJD | -5,000.00 | | 6,163.88 |

AVAILABLE BALANCE AS OF 13/NOV/2026 EUR **3,413.88**

**HAMILTON RESERVE BANK LTD.**
**CUSTOMER ACCOUNT AGREEMENT**
**Effective: September 6, 2021**

The words "you," "your," "account holder," and "Customer" mean the person or legal entity that has submitted an account application (hereinafter an "Account Application") to or opened an Account with the Bank, as well as all signatories on any Bank documentation.

The words "Bank," "we," "our," and "us" mean *Hamilton Reserve Bank Ltd.*, a bank chartered under the laws and governance of the Island of Nevis of the Federation of St. Kitts & Nevis, as well as any Bank affiliates or partners.

This is your customer agreement with the Bank (the "Agreement"). The Bank will provide you with additional agreements and documentation throughout our relationship with you which are part of this Agreement. As such, this Agreement includes:

(a) the terms and conditions governing all activity in relation to the existence and operation of your deposit accounts with the Bank.

(b) those certain additional terms and conditions that the Bank provides to you in writing prior to approving your account to utilize a particular banking service or facility including any account opening forms.

(c) all interests and Fees charged by the Bank, the benefits we supply to you, ourselves, and the terms and conditions of this Agreement, as well as any additional documentation we may provide to you from time to time.

To the extent that the Bank provides you with more specific terms and conditions regarding your Account and relationship with the Bank, those terms and conditions shall supersede those described below. Your use of a credit card offered through the Bank is not controlled by this Agreement and is instead governed by a separate agreement that is provided upon an application for a Bank issued credit card.

## DEFINITIONS

The following are definitions of some of the key terms used in this Agreement:

a. "**Account**" means any account that accepts deposits regardless of currency or asset type thatis covered by this Agreement.

b. "**Account Holder**" means the individual or business entity owning theAccount**.**

c. "**Authorised Signatory**" means any signatory to an Account Application.

d. "**Available Balance**" means the balance in your Account excluding any pending credit or

debit transactions or amounts that are not available for withdrawal pursuant to the Bank Funds Availability Policy (defined below), that we are otherwise legally obligated to pay.

e. "**Business Day**" means every day except Saturdays, Sundays, and certain Bank Holidays. Depending on the particular Bank service provided, certain business operations may be unavailable from time to time due to local bank holidays in the United States, the United Kingdom, and India.

f. "**Business Hours**" means the hours between 8:00AM and 4:00PM (Eastern Standard Time) on any Business Day.

g. "**Funds Availability Policy**" means a policy kept at the discretion of the Bank and includes a variety of factors relating to the availability of funds in an Account. While the availability of funds shall always remain subject to the Bank's unencumbered and sole discretion, it is informed by those various legal and financial risks particular to your Account. For further detail on how this policy may affect your Account, please inquire directly with Bank management.

h. "**Item**" means any ACH, wire, funds transfer, ATM withdrawal, debit or credit card purchase, Fee, charge, or other amount that is added to, or subtracted from, the balance of assets in your Account.

## ACCOUNTS & SERVICES

1. Account Opening Forms. Every person or entity opening an Account must complete a new Account Application in order to establish a basic deposit account as well as any other documentation required by the Bank in connection with additional services you use that are provided by the Bank.

2. Who Can Open Accounts with the Bank. Accounts may be opened by individuals and legal entities around the world, subject to compliance review and approval. You agree that the Bank may decline to open an Account for any reason.

3. Business Accounts. If you have opened your Account as a "Business Account" using the Business Account Application or any other documentation we have provided to you, you agree not to use the Account for personal purposes. Unless otherwise described in Bank Documentation, a "Business" or "Business Organization" shall be a corporate, limited liability company, limited company, or other legal entity formed under the laws of the jurisdiction of its formation, any governmental organization, or validly created trust. We may rely on the accuracy and authority of any and all Business resolutions, signatures, certificates of incorporation, by-laws, operating agreements, trusts, authorisations, resolutions, or other documentation provided to us, or that we request in connection with any Business Account.

4. Additional Documentation. You must also complete or provide any other documentation we may require from time to time. We will conduct due diligence in our discretion on each Account Holder and Authorised Signatory prior to the time an Account is opened. We may rely upon the documentation we have in our files regarding the identity of the Authorised

Signatories on your Account until you present appropriate documentation identifying other Authorised Signatories. If we do not obtain the information we need under our customer identification program, we reserve the right to prevent you from accessing the funds in your Account until we obtain that information, and you agree we will not be liable to you if any payment order is not paid during this time. Subject to our anti money laundering and counter terrorist financing program requirements, we will tell you in writing if we take this action.

5. Powers of Authorised Signatory to modify Account Information. No Authorised Signatory may remove or add the name of another Authorised Signatory unless the resolutions designating the Authorised Signatories specifically permit that Authorised Signatory to do so.

6. Making Deposits. You may make an electronic deposit into your Account in person at any of our branch offices, through another financial institution, or by any other physical or electronic method we make available. The Bank does not currently issue or accept cheques or accept cash deposits. We may refuse a deposit, limit the amount of a deposit, or return all or a portion of a deposit. When the Bank receives an electronic deposit to your account, the only affirmative notice you will receive from us is on your next statement. You may login to any online banking account provided by the Bank to check your balance and deposits at any time so long as that Account has been set up by you and the Bank. You may also call the Bank during regular Business Hours to confirm that we have received a deposit. Any telephone communication with Bank personnel will be subject to reasonable security procedures which you agree may be implemented subject to the sole discretion of the Bank. If the bank or other party that sent an electronic deposit to your Account advises the Bank that the transfer was made in error, or was intended for another customer or account, the Bank may immediately deduct the transferred amount from your balance without conducting an investigation into the claim of error.

7. Right to Refuse Deposits. We are not responsible for any deposit you send to us that we do not receive. All deposits to your Accounts, regardless of how made, are subject to verification, final payment, and our Funds Availability Policy. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. The Bank does not accept cash deposits and shall have no obligation whatsoever to hold, maintain, or return any cash deposit received by mail or in person.

8. Correspondent and Financial Agents. In order to provide you with the best service, the Bank may use the services of certain correspondent banks, financial entities and institutions, banking software providers, as well as digital services companies and common carriers ("Banking Agents"), as well certain funds transfer methods and account systems provided as part of the services provided by such Banking Agents in order to provide services to you under this Agreement. You agree that any Banking Agent shall be your agent with actual authority to act on your behalf in providing any banking services. As such, the Bank shall not be liable to you by reason of: (i) any act or omission by a Banking Agent that is beyond the reasonable control of the Bank, or; (ii) the loss, diminution, or destruction of any funds, security, certificate, document, or asset of any kind while in transit or custody of any Banking Agent, or while under the possession, custody, or control of a person or entity other than the Bank.

9. Calculating Interest in Your Account. The Bank may or may not pay interest on your account at the Bank's sole discretion. If interest is paid, you must be notified by the Bank in writing. The interest rate of interest accruing in your account (the annualpercentage yield or ("APY") on all interest-bearing checking, savings, brokerage, money market savings, or other Accounts may change at any time after the Account is opened. The interest rate and APY may be changed by the Bank as often as we choose, without limits and without notice. The Bank calculates interest on Accounts utilizing the daily balance method, applying a daily periodic rate to the available principal balance in your Account each day. Asa general matter, interest in your Account is calculated based on the assumption of a 365-day year. Deposits in Your Account will begin to accrue interest on the Business Day that the fundsare included under your Available Balance. Earned interest shall be paid to you by crediting the amount of the accrued interest to your Account. If you close your Account before interest is credited, we shall not be obligated to pay you that interest.

10. Withdrawals. Notwithstanding a more specific agreement with the Bank in relation to a particular Bank service or facility, Assets from your Account generally may be withdrawn three business days after they have cleared in your Account. The availability of funds in your Account to withdraw does not mean the deposit made in your Account is "good," has "cleared" or has been paid by the paying financial institution. As a general matter, and except as otherwise provided in the Agreement, you may make withdrawals from your Account up to the amount of the Available Balance using any means or method that the Bank makes available to you. We may require two forms of identification for any withdrawals or transfers out of your Account to be presented at any branch office of the Bank. We may also contact you electronically through electronic means or directly by phone to confirm your identity and verify your authorization to conduct the withdrawal. While we reserve the right to refuse a withdrawal request exceeding the available funds in your Account (even in the case of deposit made by you later in the Business Day after a withdrawal request is refused) the Bank will endeavor to make your assets available to you as promptly as possible within its discretion and the parameters of its Funds Availability Policy. For information about when funds from a deposit become available and you can withdraw them, please see the Definitions Section of the Agreement, or inquire directly with Bank management regarding the Bank Funds Availability Policy.

11. Refusal of Withdrawals. Before allowing funds to be withdrawn from your Account, we may request that you provide us with certain confirmations, identification, authorisations, documentation, or other information that the Bank determines to be necessary in its sole and absolute discretion. You acknowledge that your refusal to comply with any such request may result in the Bank's refusal to allow the withdrawal. The Bank is not required to notify you in advance if it will seek additional information prior to allowing a withdrawal from your Account.

12. Multiple Signature Requirements. If you elect to require multiple signatures in order to conduct business in your Account, this requirement will be strictly enforced by the Bank.

13. Minimum Account Balance. The Bank may require a minimum Account opening balance or equivalent value in addition to related Fees per Personal or Business Account. Should your Account opening balance fall below these minimum balances, you will receive a notice of the

deficiency. The Bank has the right in its sole discretion to close Accountsor reject Account applications for Accounts that fall below, or would not meet, the minimum required Account opening balances. The Bank may charge Fees against your Account so longas they remain under the minimum required opening balance.

14. Insufficient Balance on Withdrawal. If your available balance is not enough to pay a transaction you make and we pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Paid Fee. If we do not pay the transaction, we may assess an Insufficient or Unavailable Funds – Item Returned Fee. In either case, additional Fees may also be charged to your Account.

15. Fees. You agree to pay any fees, charges, or other costs (collectively referred to herein as "Fees") applied to your Account from the balance of your Account, even if that balance may be negative. The Bank may apply Fees to your Account for those amounts, purposes, and with any frequency, it deemsappropriate in its sole discretion. Moreover, the Bank may apply different Fees by reason of, among other things, the amount of funds or assets held in a given Account or Accounts, the services provided to an Account Holder, as well as the Account Holder's relationship with theBank. Such Fees may be applied and changed without prior notice to you and will be reflected inyour monthly statements. For more information on specific Fees and charges applied by theBank to your Account, please contact your Bank relationship manager or, as available, submita question through the Bank's secure customer portal online. While the Bank shall not be required to provide you with any particular Fee schedule, any schedule of Fees provided to youin writing shall be deemed a part of this Agreement.

16. Online Account Availability**:** Subject to the availability of any of the Bank's information technology providers and telecommunications carriers, or as necessary for the Bank to conduct maintenance or upgrades to the software or the Bank's online services, Access to any online banking services made available by the Bank will be generally available 24 hours a day and 7 days a week. As the Bank relies on various software and telecommunications systems, the Bank shall only be responsible for that information which its staff receives and shall not be liable to Account Holder for any disruptions, unavailability, or errors arising from of one or more aspects of any software if such software was implemented or is serviced by third parties.

17. Account Statements and Account Notices. All Account statements and notices will be made available to you exclusively and electronically through the Bank's online banking services and/or secure login messaging center. The Bank does not mail physical account statements or offer mail holding services. You agree that it is your responsibility to sign up for, and regularly monitor, your online account. The Bank shall not be liable for any losses that arise in your Account as the result of your failure to monitor your account or respond to Bank notice regarding your Account. Statements of your Account shall be made available online on a monthly basis and will reflect activity in your Account occurring subsequent to your last statement. Your statement shall be deemed delivered to you at the time it becomes available to you through the Bank's online banking systems. One signatory to the Account will be provided access to the online banking systems and is solely responsible for conveying all statements and notices to the Account Holder.

18. Your Obligation to Review Account Statements. You have an affirmative obligation to review all Account statements and notices online and to immediately notify the Bank of any errors in those statements or notices. Your obligation to review your Account information generally also includes:

    (a) Examining all activity in your Account and statements on a prompt and regularbasis.

    (b) Notifying the Bank within three (3) days of receipt of the information of all errors in any statement, notice, or on your Account, including the identification of any pieceof information you believe may have been altered.

19. Foreign Currency Transactions. Any transactions we conduct involving a foreign currency on your behalf will use a Bank determined foreign exchange rate which will include a spread and may include certain other Fees, such as commissions or other costs that we, our vendors, affiliates, or counterparties may charge in providing or facilitating foreign exchange transactions. The particular rates applied may depend on a variety of factors, including your relationship with the Bank, the type or frequency of transactions, the value of the transactions on an individual or aggregate basis, the type of currency, the date and time of the exchange, and whether the transaction results in a debit or credit to your Account. As the result of the costs to the Bank and the value of the services, these rates may be less favorable than those quoted on the internet.

20. Death or Incompetence of Account Owner or Affecting Signatory Authority. You must notify the Bank immediately upon the death, dissolution, or incompetence of any Account Holder or Authorised Signatory to your Account. After we receive any such notice, whether from you or from other sources, we may freeze the balance of the Account, refuse any transactions, as well as return or otherwise reverse deposits. The Bank may further refuse to release any assets until reasonable documentation is provided verifying or disproving the Account Holder or any Authorised Signatory's death or incompetence, as well as, in the case of such death, dissolution, or incompetence, who is entitled to the assets of the Account. If you die or the entity Account Holder is dissolved while residing outside of Nevis, we may require a personal representative be appointed in a court of competent jurisdiction to manage the Account Holder's interests prior to releasing any assets. Any tax liability arising against the Bank as the result of the death, dissolution, or incompetence of the Account Holder shall be deducted from any transfer out of the Account.

    If you owe any debt to the Bank at the time of your death or dissolution, the Bank shall have the full and absolute right to exercise its right of set off (which is the Bank's right to apply funds in one Account to the debt associated with another Account with the same Account Holder) or security interest rights against any funds credited to your balance after your death or dissolution. These rights shall withstand the rights of any beneficiary of any trust that may have rights to the Account or the property and rights of the Account Holder.

21. Power of Attorney. A power of attorney is a document that you sign authorizing someone else to act on your behalf. In this relationship the person acting on your behalf is your agent. Once

signed, the agent can sign on your behalf and do everything that you could do for your Account, including withdrawing or otherwise spending all of the money in the Account. You should not sign a power of Attorney that grants control over your Account (whether generally or specifically) unless you trust the agent you are appointing to act in your best interests. If you choose to appoint an agent by power of attorney, it must be through a power of attorney form that we agree to accept. We may rely on an original power of attorney and may follow or refuse to follow an agent's requests at any time for any reason, for example if we suspect fraud or abuse of your Account. The Bank shall have no liability arising from its decision to follow or refuse instructions from an agent.

22. Closing Your Account. You or the Bank may close your Account at any time for any reason or no reason and without prior notice to you or the Bank. The Bank is however not required to close any Account under the following circumstances: (a) if you have pending or otherwise unresolved transactions; (b) it is not possible to close, liquidate, or otherwise pay-out the assets held in your Account; (c) where the Account is overdrawn, and; (d) where the Account is subject to legal process initiated in the Island of Nevis. After your Account is closed, we have no obligation to accept deposits, or to otherwise engage in any business with you whatsoever.

23. Use of Information. As a Customer, the Bank appreciates the importance of confidentiality while ensuring compliance with applicable law. As such, the Bank will collect personal information from you only on a as needed basis. All information collected by the Bank is subject to strict confidentiality protections and procedures, including procedural, physical, and electronic safeguards to secure your information from unauthorised use and accidental or unlawful alteration and destruction. We hold our employees accountable for complying with the strictest confidentiality procedures. We will retain copies of information in paper or electronic form at our discretion, and as a general matter, only so long as is necessary to comply with applicable law or as necessary to exercise any legal rights with respect to your relationship with the Bank. You hereby authorise the Bank to use and share your information solely as may be necessary to provide services requested by You, conduct due diligence or otherwise maintain a high standard for the Bank's internal legal, operating, and compliance processes (for example as part of the Bank's ongoing Anti Money Laundering procedures), or as otherwise necessary to comply with the laws of the Island of Nevis or any other jurisdiction in which you or the Bank conducts its business.

24. Disputes Involving Account Control. Should any dispute arise from the provision of conflicting instructions to the Bank from one or more Authorised Signatories, we may freeze the funds until there is a clear resolution from all Authorised Signatories and the Account Holder or from a court of jurisdiction deemed competent by the Bank.

25. Certification of Legal Use of Account. You hereby certify, agree and attest that you shall not use this Account or any other account or relationship with the bank to engage in any illegal conduct or activity, including but not limited to fraud, money laundering, terrorist financing, proliferation of weapons of mass destruction, human or drug trafficking.

26. Restricting the Account. In order to protect you or the Bank, some or all of the services in your Account and any transaction, whether in pending or requested, in your Account may be refused,

frozen, reversed, or delayed for any reason in the Bank's sole discretion.

27. Liability, Indemnification and Customer Instructions. We will not be liable for anything we do when following your instructions or the instructions of your agents. Furthermore, the Bank shall not be liable should it fail to follow your instructions or your agents' instructions so long as the Bank believes that such instructions may expose the Bank to potential losses, civil or criminal liability, or otherwise conflict with any customary banking practice. The Bank will not be liable for indirect, special, or consequential damages regardless of the form of action and even if the Bank has been advised of the possibility of such damages. If the Bank is found at fault by the Nevis court for failing to prevent fraudulent access to your Account by means of any forged Account Holder signature or representation, the Bank's liability, if any, shall be limited to the face amount of the Item. To the extent that there is a discrepancy between your instruction and the Bank's interpretation of that instruction, the Bank's interpretation shall control. You hereby authorize the Bank to accept Account instructions by electronic means and hereby agree to indemnify, defend, and hold the Bank harmless from any losses orclaims arising in connection with your decision to communicate with the Bank through any means, electronic or otherwise.

28. Wealth Management Services. Account Holder has appointed the Bank as its agent and attorney-in-fact to buy and sell securities or other investment products, as well as provide advice, guidance and investment related services for the Account at Account Holder's risk. Account Holder hereby agrees to indemnify and hold the Bank, and its officers, directors, agents, employees and affiliates harmless from all loss, cost, indebtedness and liabilities arising there from. In all such purchases and sales, the Bank is authorized to follow the instructions of the Account Holder in every respect concerning the Account and, except as herein otherwise provided, the Bank is authorized to act for Account Holder in the same manner and with the same force and effect as Account Holder might or could do with respect to such purchases and sales as well as with respect to all other things necessary or incidental thereto, except that the Bank is not authorized to withdraw any money, securities or other property either in the name of Account Holder or otherwise. This authorization is a continuing one and shall remain in full force and effect until terminated in writing. Termination of this authorization shall constitute a material breach of this Agreement by the Account Holder. In no event will the Bank be obligated to affect any transaction for Account Holder which it believes would be violative of any applicable law, rule or regulation, or of the rules or regulations of any regulatory or self-regulatory body. In the event the Account Holder instructs the Bank to purchase, sell, or otherwise modify any investment or financial products for Account Holder's own investment account, Account Holder authorizes the Bank to deduct any and all fees when due from the assets contained in that investment account, including fees charged by any financial advisor to the Bank, and pay them to the such advisor(s) on behalf of Account Holder. The Bank will pay the amount shown to be due on the invoice and will not verify the rate, computation, or timing of the Advisor's fee or the value of the assets used in this connection. Account Holder understands that the Bank and its affiliates may perform, among other things, investment banking, research, brokerage, and investment advisory services for other account holders or clients. Account Holder recognizes that the Bank may give advice and take action in the performance of its duties to other account holders or other clients which may differ from advice given, or in the timing and nature of action taken, with respect to Account Holder. Moreover,

the Bank or any of its affiliates may advise or take action with respect to itself or themselves differently than with respect to Account Holder. Nothing in this Agreement shall be deemed to impose on the Bank any obligation to recommend any investment for purchase or sale, for Account Holder any investment which the Bank may recommend for purchase or sale, for its own account, or for the account of any other account holder or client, nor shall anything on this Agreement be deemed to impose upon the Bank any obligation to give Account Holder the same advice, pricing, or terms of any particular investment as may be given to any other account holders, other clients, itself or third parties. All wealth management and advisory services are offered and sold exclusively by the Bank itself on a direct and private basis to existing customers, and not on behalf of any other financial services providers.

29. No Waiver. The failure by the Bank to enforce any of the rights or terms in pursuant to this Agreement shall not be deemed a waiver of any of those rights or terms. The Bank may still enforce all of its rights under this Agreement, even if it fails to exercise any or all of those rights.

30. Changes to the Agreement. This Agreement, any Fees, or features of your Account, may be updated from time to time at the Bank's discretion and without prior notice to you. The Bank may direct you to its website at www.hrbank.com for the content of any revised Agreement or may publish any revised Agreement through any of the electronic or online services provided by the Bank. By maintaining your Account after the publication of any changes to the Agreement, you agree to those changes.

31. Conflicts. If this Agreement conflicts with any statement or writing made by one of the Bank's employees, this Agreement will govern. To the extent that additional terms and conditions are provided to you for specific services under this Agreement in writing, the additional terms shall control to the extent that they do not conflict with this Bank Customer Agreement. To the extent that any terms of this Agreement may be determined by a court of competent jurisdiction in Nevis to be unenforceable, the unenforceability of such terms shall not affect the validity or effect of the remainder of this Agreement.

32. Merger. The terms of this Agreement along with any account forms or other formal written documentation provided to you by the Bank form one and the same Agreement unlessotherwise stated on, or as a part of, such other documentation, and supersede all prior written or oral agreements between you and the Bank. In the event of any dispute arising from any subsequent or contemporaneous communications, forms, or agreements between you and the Bank, regardless of the language of those communications, forms or agreements, this Agreement shall control.

33. Agreement to Arbitrate. In the event of a dispute arising out of or relating to this contract, including any question regarding its existence, validity or termination, the parties shall first seek settlement of that dispute by mediation with a mediator selected by the Bank. If the dispute is not settled by mediation within 120 days of the appointment of the mediator, or such further period as the parties shall agree in writing, the dispute shall be referred to and finally resolved by arbitration by an arbitrator selected by the parties and subject to the law and rules of procedure of the courts of Nevis, which rules are deemed to be incorporated by reference into

this clause. The language to be used in the mediation and in the arbitration shall be English. The number of arbitrators shall be three and the seat, or legal place, of arbitration shall be Charlestown, Nevis. You irrevocably waive, to the fullest extent permitted by law, all right to a public trial in any action, proceeding, and with respect to any claim of any kind whatsoever relating thereto, including but not limited to any counter claim, action sounding in tort, fraud, or otherwise, arising or related in any way to your relationship with the Bank.

34. Choice of Law and Forum. In the sole event that the Agreement to arbitrate contained in this Agreement is or becomes unenforceable, you hereby agree and irrevocably consent that your Account and relationship with the Bank shall be governed and construed exclusively by the laws and subject to the exclusive jurisdiction of Nevis, without regard to any conflict of law provision or consideration that may otherwise be applicable. For the avoidance of doubt, the arbitration clause of this Agreement shall govern all claims and disputes arising in connection with your Account and relationship with the Bank unless it is determined to be unenforceable as a matter of law.

35. Assignment and Successors. This Agreement shall be binding on your personal representative, executors, administrators. You may not assign, transfer, grant any security interest in or otherwise hypothecate, this Agreement without the Bank's prior written consent. Even with the Bank's prior written consent, no assignment of this Agreement will be valid or binding on the Bank, unless the Bank at its discretion records such approval of the assignment in our records and provides you with certified notice of that record.

36. Referrals. Upon request, our employees may provide contact information for third parties, including lawyers, accountants, or contractors who offer products and services not offered by the Bank. Some of these third parties may be Bank customers. While such referrals or information are provided solely as a courtesy to you and the third party, we or our affiliates may be compensated for referrals that we provide. The Bank makes no representations, and expressly disclaims all warranties, regarding the services or products of any third parties that we refer. If you decide to do business with a party referred to by the Bank, that decision is yoursalone and the Bank is not responsible for the third-party's performance, conduct, or to assist inthe resolution of any disputes between you and the third-party.

37. Execution and Modification by Conduct. You agree that the submission to the Bank of any Account Application by you or any agent acting on your behalf, the initial or continued use of any Account provided by the Bank, or use of the banking, investment, or other financial or non-financial services generally providedby the Bank to You, shall constitute conclusive proof that you, as well as any owner or party having control of your Account, agree to the terms and conditions of this Agreement which terms cover the entirety of your past, present, and future relationship with the bank and supersede any applicable terms and conditions. Furthermore, you agree to be legally bound and obligated by any action taken by one or more authorized signatories to your Account. As such, Account Holder(s) and Authorized Signer(s) named in the Account Application hereby certify and attest that I/we am/are the natural person(s) who is/are applying to open this Account with Hamilton Reserve Bank Ltd. ("HRB"), and that I/we hereby represent and attest that: (i) I/we will not use the services of HRB for any unlawful activity or purpose; (ii) I/we have read, understand, and agree to this Hamilton Reserve Bank

Ltd. Customer Account Agreement; (iii) all information that I/we have provided to HRB is true, accurate and complete; (iv) I/we will notify HRB immediately of any material changes to the information contained in this application, and; (v) I/we authorize HRB to be an information processor and make initial and ongoing credit and other inquiries with third-parties in connection with my/our Account for purposes of compliance with applicable law and the provision of financial services. (End of Agreement. Customer consent page follows.)

HAMILTON
RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** RJJ International Holdings, LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of RJJ International Holdings, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Diana Claxton-Whittaker

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of RJJ International Holdings, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Marc Brühwiler

Title: Vice President, Banking

*Signature*

Date: 14 June 2024

HAMILTON RESERVE BANK

**IN WITNESS WHEREOF,** and by my/our signature(s) here below, I/we, hereby agree to the terms of this Agreement as of the date set forth below:

**Account Holder Name:** RJJ International Holdings, LLC

Primary Authorized Signer ("You"):

Name: Harald Linhart

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of RJJ International Holdings, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Diana Claxton-Whittaker

Title: Manager of Lighthouse Management Services, LLC, which serves as Manager of RJJ International Holdings, LLC

*Signature*

Date: 14 June 2024

Additional Authorized Signer ("You"):

Name: Marc Brühwiler

Title: Vice President, Banking

*Signature*

Date: 14 June 2024

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel Pascucci (*pro hac vice* pending)
12636 High Bluff Drive, Suite 325
San Diego, CA 92130
Telephone: (619) 467-1801
Email: dpascucci@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAMILTON RESERVE BANK LTD.<br><br>Debtor. | Chapter 11<br><br>Case No. 26 - _____ (__) |

## CORPORATE OWNERSHIP STATEMENT OF RJJ INTERNATIONAL HOLDINGS, LLC

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rules 1010-1 and 7007.1-1 of the Local Bankruptcy Rules for the Southern District of New York, petitioner RJJ International Holdings, LLC (the "Petitioner"), states that it is a limited liability company organized under the laws of Belize. RJJ Irrevocable Trust, a Belize international trust settled on June 6, 2013, holds 100% of the Petitioner's equity interests.

**Declaration Under Penalty of Perjury**

I, the undersigned authorized representative of the Petitioner, declare under penalty of perjury that I have reviewed the "Corporate Ownership Statement" and that it is true and correct

to the best of my knowledge, information and belief, with reliance on appropriate corporate officers.

Dated: November 13, 2026

By: /s/ *Harald Linhart*
Harald Linhart
*General Manager of Lighthouse International Services, LLC, as manager of RJJ International Holdings, LLC*